# Exhibit B

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is made as of March 6, 2008, by and among Barkley Evergreen & Partners, Inc, a Missouri corporation ("Buyer"), Ripple Effects Interactive, Inc., a Pennsylvania corporation ("Seller"), and Louis Malafarina, an individual ("Malafarina").

### RECITALS

A.     Malafarina owns approximately ███████████████████████ of the issued and outstanding shares of the common stock, no par value, of Seller.

B.     Seller desires to sell, and Buyer desires to purchase, the Assets of Seller, for the consideration and on the terms set forth in this Agreement.

### AGREEMENT

The parties, intending to be legally bound, agree as follows:

**1.     DEFINITIONS**

For purposes of this Agreement, the following terms have the meanings specified or referred to in this Section 1:

*"Accounts Receivable"* – (a) all trade accounts receivable and other rights to payment from customers of Seller that are parties to the Assumed Contracts and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of goods shipped or products sold or services rendered to customers of Seller, (b) all other accounts or notes receivable of Seller other than any notes receivable from Shareholders and the full benefit of all security for such accounts or notes, and (c) any claim, remedy or other right related to any of the foregoing.

*"Assets"* – as defined in Section 2.1.

*"Assignment and Assumption Agreement"* – as defined in Section 2.7(a)(ii).

*"Assumed Contracts"* – as defined in Section 2.1(c).

*"Assumed Liabilities"* – as defined in Section 2.4(a).

*"Balance Sheet"* – as defined in Section 3.4.

*"Best Efforts"* – the efforts that a prudent Person desirous of achieving a result would use in similar circumstances to ensure that such result is achieved as expeditiously as possible; provided, however, that an obligation to use Best Efforts under this Agreement does not require

the Person subject to that obligation to take actions that would result in a materially adverse change in the benefits to such Person of this Agreement and the Contemplated Transactions.

*"Bill of Sale"* – as defined in Section 2.7(a)(i).

*"Breach"* – a "Breach" of a representation, warranty, covenant, obligation, or other provision of this Agreement or any instrument delivered pursuant to this Agreement will be deemed to have occurred if there is or has been (a) any inaccuracy in or breach of, or any failure to perform or comply with, such representation, warranty, covenant, obligation, or other provision, or (b) any claim (by any Person) or other occurrence or circumstance that is or was inconsistent with such representation, warranty, covenant, obligation, or other provision, and the term "Breach" means any such inaccuracy, breach, failure, claim, occurrence, or circumstance.

*"Bulk Sale Clearance Certificate"* – as defined in Section 5.2.

*"Bulk Sales Laws"* – as defined in Section 5.2.

*"Buyer"* – as defined in the first paragraph of this Agreement.

*"Closing"* – as defined in Section 2.6.

*"Closing Date"* – as defined in Section 2.6.

*"Collected Old Receivables"* – all Account Receivables which are over 90 days old as of the date hereof which are subsequently collected by Buyer no later than March 6, 2009.

*"Consent"* – any approval, consent, ratification, waiver, or other authorization (including any Governmental Authorization).

*"Consulting Agreements"* – as defined in Section 2.7(c)(ii).

*"Contemplated Transactions"* – all of the transactions contemplated by this Agreement, including:

(a)     the sale of the Assets by Seller to Buyer;

(b)     the execution, delivery, and performance of the Employment Agreements, and the Noncompetition Agreement;

(c)     the performance by Buyer, Seller and Malafarina of their respective covenants and obligations under this Agreement; and

(d)     Buyer's acquisition and ownership of the Assets and assumption of the Assumed Liabilities.

*"Continuing Employees"* – as defined in Section 2.4(a)(iv)

**"Contract"** – any agreement, contract, obligation, promise, or undertaking (whether written or oral and whether express or implied) that is legally binding, including purchase orders and statements of work pursuant to which parties have agreed to provide goods or services.

**"Damages"** – as defined in Section 10.2.

**"Disclosure Letter"** – the disclosure letter delivered by Seller and Shareholders to Buyer concurrently with the execution and delivery of this Agreement.

**"Employment Agreements"** – as defined in Section 2.7(c)(i).

**"Encumbrance"** – any charge, claim, community property interest, condition, equitable interest, lien, option, pledge, security interest, right of first refusal, or restriction of any kind, including any restriction on use, voting, transfer, receipt of income, or exercise of any other attribute of ownership.

**"Environment"** – soil, land surface or subsurface strata, surface waters (including navigable waters, ocean waters, streams, ponds, drainage basins, and wetlands), ground waters, drinking water supply, stream sediments, ambient air (including indoor air), plant and animal life, and any other environmental medium or natural resource.

**"Environmental, Health, and Safety Liabilities"** – any cost, damages, expense, liability, obligation, or other responsibility arising from or under Environmental Law or Occupational Safety and Health Law and consisting of or relating to:

(a)     any environmental, health, or safety matters or conditions (including on-site or off-site contamination, occupational safety and health, and regulation of chemical substances or products);

(b)     fines, penalties, judgments, awards, settlements, legal or administrative proceedings, damages, losses, claims, demands and responses, and investigative, remedial, or inspection costs and expenses arising under Environmental Law or Occupational Safety and Health Law;

(c)     financial responsibility under Environmental Law or Occupational Safety and Health Law for cleanup costs or corrective action, including any investigation, cleanup, removal, containment, or other remediation or response actions ("Cleanup") required by applicable Environmental Law or Occupational Safety and Health Law (whether or not such Cleanup has been required or requested by any Governmental Body or any other Person) and for any natural resource damages; or

(d)     any other compliance, corrective, investigative, or remedial measures required under Environmental Law or Occupational Safety and Health Law.

*Page 3*

The terms "removal," "remedial," and "response action," include the types of activities covered by the United States Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq., as amended ("CERCLA").

*"Environmental Law"* – any Legal Requirement that requires or relates to:

(a)   advising appropriate authorities, employees, and the public of intended or actual releases of pollutants or hazardous substances or materials, violations of discharge limits, or other prohibitions and of the commencements of activities, such as resource extraction or construction, that could have significant impact on the Environment;

(b)   preventing or reducing to acceptable levels the release of pollutants or hazardous substances or materials into the Environment;

(c)   reducing the quantities, preventing the release, or minimizing the hazardous characteristics of wastes that are generated;

(d)   assuring that products are designed, formulated, packaged, and used so that they do not present unreasonable risks to human health or the Environment when used or disposed of;

(e)   protecting resources, species, or ecological amenities;

(f)   reducing to acceptable levels the risks inherent in the transportation of hazardous substances, pollutants, oil, or other potentially harmful substances;

(g)   cleaning up pollutants that have been released, preventing the threat of release, or paying the costs of such clean up or prevention; or

(h)   making responsible parties pay private parties, or groups of them, for damages done to their health or the Environment, or permitting self-appointed representatives of the public interest to recover for injuries done to public assets.

*"ERISA"* – the Employee Retirement Income Security Act of 1974 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

*"Escrow Agent"* – as defined in Section 2.7(d).

*"Escrow Agreement"* – as defined in Section 2.7(a)(v).

*"Escrow Amount"* – as defined in Section 2.7(d).

*"ESOP"* – the Barkley Evergreen & Partners Employee Stock Ownership Plan.

*"Facilities"* – any premises under the Office Leases, including the common areas, parking lots and equipment covered under or related to the Office Leases.

*"GAAP"* – generally accepted United States accounting principles, applied on a basis consistent with the basis on which the Balance Sheet and the other financial statements referred to in Section 3.4 were prepared.

*"Governmental Authorization"* – any approval, consent, license, permit, waiver, or other authorization issued, granted, given, or otherwise made available by or under the authority of any Governmental Body or pursuant to any Legal Requirement.

*"Governmental Body"* – any:

(a)   nation, state, county, city, town, village, district, or other jurisdiction of any nature;

(b)   federal, state, local, municipal, foreign, or other government;

(c)   governmental or quasi-governmental authority of any nature (including any governmental agency, branch, department, official, or entity and any court or other tribunal);

(d)   multi-national organization or body; or

(e)   body exercising, or entitled to exercise, any administrative, executive, judicial, legislative, police, regulatory, or taxing authority or power of any nature.

*"Hazardous Activity"* – the distribution, generation, handling, importing, management, manufacturing, processing, production, refinement, Release, storage, transfer, transportation, treatment, or use (including any withdrawal or other use of groundwater) of Hazardous Materials in, on, under, about, or from the Facilities or any part thereof into the Environment, and any other act, business, operation, or thing that increases the danger, or risk of danger, or poses an unreasonable risk of harm to persons or property on or off the Facilities, or that may affect the value of the Facilities or Seller.

*"Hazardous Materials"* – any waste or other substance that is listed, defined, designated, or classified as, or otherwise determined to be, hazardous, radioactive, or toxic or a pollutant or a contaminant under or pursuant to any Environmental Law, including any admixture or solution thereof, and specifically including petroleum and all derivatives thereof or synthetic substitutes therefore and asbestos or asbestos-containing materials.

*"Intellectual Property Assets"* – as defined in Section 3.25.

*"Interim Balance Sheet"* – as defined in Section 3.4.

**"IRC"** – the Internal Revenue Code of 1986 or any successor law, and regulations issued by the IRS pursuant to the Internal Revenue Code or any successor law.

**"IRS"** – the United States Internal Revenue Service or any successor agency, and, to the extent relevant, the Unites States Department of Treasury.

███████ – as defined in Section 7.9.

**"Key Consultants"** – as defined in Section 2.10(b).

**"Key Employees"** – as defined in Section 2.10(a).

**"Knowledge"** – an individual will be deemed to have "Knowledge" of a particular fact or other matter if:

(a)     such individual is actually aware of such fact or other matter; or

(b)     a prudent individual could be expected to discover or otherwise become aware of such fact or other matter in the course of conducting a reasonably comprehensive investigation concerning the existence of such fact or other matter.

A Person (other than an individual) will be deemed to have "Knowledge" of a particular fact or other matter if any individual who is serving, or who has at any time served, as a director, officer, partner, executor, or trustee of such Person (or in any similar capacity) has, or at any time had, Knowledge of such fact or other matter.

**"Lease"** – any lease or rental agreement, license, right to use or installment and conditional sale agreement to which Seller is a party and any other Seller Contract pertaining to the leasing or use of any Tangible Personal Property.

**"Legal Requirement"** – any federal, state, local, municipal, foreign, international, multinational, or other administrative order, constitution, law, ordinance, principle of common law, regulation, statute, or treaty.

**"Liability"** – with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise and whether or not the same is required to be accrued on the financial statements of such Person.

**"Malafarina"** – as defined in the first paragraph of this Agreement.

**"Material Consents"** – as defined in Section 7.3.

**"Noncompetition Agreements"** – as defined in Section 2.7(c)(iii).

*"Occupational Safety and Health Law"* – any Legal Requirement designed to provide safe and healthful working conditions and to reduce occupational safety and health hazards.

*"Office Leases"* – all leases for office space to which Seller is a party.

*"Order"* – any award, decision, injunction, judgment, order, ruling, subpoena, or verdict entered, issued, made, or rendered by any court, administrative agency, or other Governmental Body or by any arbitrator.

*"Ordinary Course of Business"* – an action taken by a Person will be deemed to have been taken in the "Ordinary Course of Business" only if:

(a)   such action is consistent with the past practices of such Person and is taken in the ordinary course of the normal day-to-day operations of such Person; and

(b)   such action is not required to be authorized by the board of directors of such Person (or by any Person or group of Persons exercising similar authority) and is not required to be specifically authorized by the parent company (if any) of such Person.

*"Organizational Documents"* – (a) the articles or certificate of incorporation and the bylaws of a corporation; (b) the partnership agreement and any statement of partnership of a general partnership; (c) the limited partnership agreement and the certificate of limited partnership of a limited partnership; (d) the articles of organization and the operating agreement of a limited liability company, (e) any charter or similar document adopted or filed in connection with the creation, formation, or organization of a Person; and (f) any amendment to any of the foregoing.

*"Permitted Encumbrances"* – as defined in Section 3.9.

*"Person"* – any individual, corporation (including any non-profit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union, or other entity or Governmental Body.

*"Plan"* – as defined in Section 3.16.

*"Proceeding"* – any action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative, investigative, or informal) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Body or arbitrator.

*"Record"* – information that is inscribed in a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*"Related Person"* – with respect to a particular individual:

(a)   each other member of such individual's Family;

(b)    any Person that is directly or indirectly controlled by such individual or one or more members of such individual's Family;

(c)    any Person in which such individual or members of such individual's Family hold (individually or in the aggregate) a Material Interest; and

(d)    any Person with respect to which such individual or one or more members of such individual's Family serves as a director, officer, partner, executor, or trustee (or in a similar capacity).

With respect to a specified Person other than an individual:

(a)    any Person that directly or indirectly controls, is directly or indirectly controlled by, or is directly or indirectly under common control with such specified Person;

(b)    any Person that holds a Material Interest in such specified Person;

(c)    each Person that serves as a director, officer, partner, executor, or trustee of such specified Person (or in a similar capacity);

(d)    any Person in which such specified Person holds a Material Interest;

(e)    any Person with respect to which such specified Person serves as a general partner or a trustee (or in a similar capacity); and

(f)    any Related Person of any individual described in clause (b) or (c).

For purposes of this definition, (a) the "Family" of an individual includes (i) the individual, (ii) the individual's spouse and former spouses, (iii) any other natural person who is related to the individual or the individual's spouse within the second degree, and (iv) any other natural person who resides with such individual, and (b) "Material Interest" means direct or indirect beneficial ownership (as defined in Rule 13d-3 under the Securities Exchange Act of 1934) of voting securities or other voting interests representing at least 20% of the outstanding voting power of a Person or equity securities or other equity interests representing at least 20% of the outstanding equity securities or equity interests in a Person.

"*Release*" – any spilling, leaking, emitting, discharging, depositing, escaping, leaching, dumping, or other releasing into the Environment, whether intentional or unintentional.

"*Representative*" – with respect to a particular Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors.

"*Retained Liabilities*" – as defined in Section 2.4(b).

*"Securities Act"* – the Securities Act of 1933 or any successor law, and regulations and rules issued pursuant to that Act or any successor law.

*"Seller"* – as defined in the first paragraph of this Agreement.

*"Seller Contract"* – any Contract (a) under which Seller has or may acquire any rights or benefits, (b) under which Seller has or may become subject to any obligation or liability, or (c) by which Seller or any of the assets owned or used by Seller is or may become bound.

*"Seller's 401(k) Plan"* – means the pension plan that Seller sponsors under Section 401(k) of the IRC known as the Ripple Effects Interactive, Inc. 401(k) Plan.

*"Shareholders"* – Malafarina and Carlton Kelly.

*"Subsidiary"* – with respect to any Person (the "Owner"), any corporation or other Person of which securities or other interests having the power to elect a majority of that corporation's or other Person's board of directors or similar governing body, or otherwise having the power to direct the business and policies of that corporation or other Person (other than securities or other interests having such power only upon the happening of a contingency that has not occurred) are held by the Owner or one or more of its Subsidiaries; when used without reference to a particular Person, "Subsidiary" means a Subsidiary of Seller.

*"Tangible Personal Property"* – all machinery, equipment, tools, furniture, office equipment, computer hardware, supplies, materials, vehicles and other items of tangible personal property (other than Inventories) of every kind owned or leased by Seller (wherever located and whether or not carried on Seller's books), together with any express or implied warranty by the manufacturers or sellers or lessors of any item or component part thereof, and all maintenance records and other documents relating thereto.

*"Tax"* – any income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, property, environmental, windfall profit, customs, vehicle, airplane, boat, vessel or other title or registration, capital stock, franchise, employees' income withholding, foreign or domestic withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, value added, alternative, add-on minimum, and other tax, fee, assessment, levy, tariff, charge or duty of any kind whatsoever, and any interest, penalties, additions or additional amounts thereon, imposed, assessed, collected by or under the authority of any Governmental Body or payable under any tax-sharing agreement or any other Contract.

*"Tax Return"* – any return (including any information return), report, statement, schedule, notice, form, or other document or information filed with or submitted to, or required to be filed with or submitted to, any Governmental Body in connection with the determination, assessment, collection, or payment of any Tax or in connection with the administration, implementation, or enforcement of or compliance with any Legal Requirement relating to any Tax.

**"Threat of Release"** – a substantial likelihood of a Release that may require action in order to prevent or mitigate damage to the Environment that may result from such Release.

**"Threatened"** – a claim, Proceeding, dispute, action, or other matter will be deemed to have been "Threatened" if any demand or statement has been made (orally or in writing) or any notice has been given (orally or in writing), or if any other event has occurred or any other circumstances exist, that would lead a prudent Person to conclude that such a claim, Proceeding, dispute, action, or other matter is likely to be asserted, commenced, taken, or otherwise pursued in the future.

**"2007 Audit"** – as defined in Section 5.12.

**"Working Capital"** – current Accounts Receivable (being those receivables less than 90 days old), less all existing current trade account payables included in the Assumed Liabilities and any reserves for uncollected Accounts Receivable, all determined according to GAAP, and as further modified and calculated pursuant to the estimated Working Capital schedule prepared and agreed upon by the parties at Closing.

## 2.    SALE AND TRANSFER OF ASSETS; CLOSING

### 2.1    ASSETS TO BE SOLD

Subject to the terms and conditions of this Agreement, at the Closing, Seller shall sell, convey, assign, transfer and deliver to Buyer, free and clear of any Encumbrances other than Permitted Encumbrances, and Buyer shall purchase and acquire from Seller, all of Seller's right, title and interest in and to all of Seller's property and assets, real, personal or mixed, tangible and intangible, of any kind and description, wherever located, including the following (but excluding the Excluded Assets):

(a)    those items of Tangible Personal Property set forth on Schedule 2.1(a);

(b)    all Accounts Receivable;

(c)    those Seller Contracts set forth on Schedule 2.1(c), including all work-in-progress related to such contracts (the "Assumed Contracts"), and those outstanding offers or solicitations made by or to Seller to enter into a contract for the performance of services set forth on Schedule 2.1(c);

(d)    all Governmental Authorizations and all pending applications therefor or renewals thereof, in each case to the extent transferable to Buyer, including those listed in Part 3.17(b) of the Disclosure Letter;

(e)    all data and Records related to the operations of Seller, including client and customer lists and Records, referral sources, research and development reports and Records, production reports and Records, service and warranty Records, equipment logs, operating guides and manuals, financial and accounting Records,

creative materials, advertising materials, promotional materials, studies, reports, correspondence and other similar documents and Records and, subject to Legal Requirements, copies of all personnel records and other Records described in Section 2.2(e);

(f) all of the intangible rights and property of Seller, including Intellectual Property Assets, going concern value, good-will, telephone, telecopy and e-mail addresses, web sites and listings;

(g) all insurance benefits, including rights and proceeds, arising from or relating to the Assets or the Assumed Liabilities prior to the Closing Date, unless expended in accordance with this Agreement;

(h) all claims of Seller against third parties relating to the Assets, whether choate or inchoate, known or unknown, contingent or non-contingent; and

(i) all rights of Seller relating to deposits and prepaid expenses, claims for refunds and rights to offset in respect thereof which are not excluded under Section 2.2(f).

All of the foregoing property and assets are herein referred to collectively as the "Assets."

Notwithstanding the foregoing, the transfer of the Assets pursuant to this Agreement shall not include the assumption of any Liability in respect thereof unless Buyer expressly assumes such Liability pursuant to Section 2.4(a).

## 2.2 EXCLUDED ASSETS

Notwithstanding anything to the contrary contained in Section 2.1 or elsewhere in this Agreement, the following items (collectively, the "Excluded Assets") are not part of the sale and purchase contemplated hereunder and are excluded from the Assets, and shall remain the property of Seller after the Closing:

(a) the minute books, stock Records and corporate seal of Seller;

(b) the shares of capital stock of Seller held in treasury;

(c) all of Seller's insurance policies and rights thereunder (except to the extent specified in Section 2.1(g) and (h));

(d) all Seller Contracts not included as Assumed Contracts;

(e) all personnel Records and other Records that Seller is required by law to retain in its possession;

(f) all claims for refund of Taxes and other governmental charges of whatever nature;

(g)     all rights in connection with and assets of the Employee Plans, including Seller's 401(k) Plan;

(h)     all rights of Seller under this Agreement, the Bill of Sale, the Assignment and Assumption Agreement and the Escrow Agreement;

(i)     all accounts or notes receivable not included in the Accounts Receivable; and

(j)     any of the assets set forth on Schedule 2.2(j).

### 2.3     PURCHASE PRICE

The purchase price (the "Purchase Price") for the Assets will be ███████████████████████ subject to adjustment as set forth in Section 2.8, plus Collected Old Receivables.

### 2.4     LIABILITIES

(a)     Assumed Liabilities. On the Closing Date, Buyer shall assume and agree to discharge only the following Liabilities of Seller (the "Assumed Liabilities"):

>  (i)     any trade account payable reflected on the Interim Balance Sheet (other than a trade account payable to any Shareholder or a Related Person of any Shareholder) which remains unpaid at and is not delinquent as of the Closing Date;

>  (ii)    any trade account payable (other than a trade account payable to any Shareholder or a Related Person of any Shareholder) that has been incurred by Seller in the Ordinary Course of Business between the date of the Interim Balance Sheet and the Closing Date which remains unpaid at and is not delinquent as of the Closing Date;

>  (iii)   any Liability arising after the Closing Date under the Assumed Contracts (other than any Liability arising under Assumed Contracts arising out of or relating to a Breach which occurred prior to the Closing Date);

>  (iv)    any Liability relating to those employees of Seller that are hired by Buyer at Closing (the "Continuing Employees") arising after the Closing Date; and

>  (v)     any liability not otherwise included above but which is included as a liability assumed by Buyer under the Working Capital schedule agreed to at Closing.

(b)     Retained Liabilities. "Retained Liabilities" shall mean every Liability of Seller other than the Assumed Liabilities. The Retained Liabilities shall remain the sole

responsibility of and shall be retained, paid, performed and discharged solely by Seller. Retained Liabilities shall include:

(i) any Liability arising out of or relating to services performed by Seller, or activities of Seller, prior to the Closing Date other than to the extent assumed under Section 2.4(a)(i), (ii) and (iii);

(ii) any Liability under any Assumed Contract which arises out of or relates to any Breach that occurred prior to the Closing Date;

(iii) any Liability for Taxes, including (A) any Taxes arising as a result of Seller's operation of its business or ownership of the Assets prior to the Closing Date, (B) any Taxes that will arise as a result of the sale of the Assets pursuant to this Agreement, and (C) any deferred Taxes of any nature;

(iv) any Liability under any Contract not included as Assumed Contracts;

(v) any Environmental, Health and Safety Liabilities arising out of or relating to the operation of Seller's business or Seller's leasing, ownership or operation of real property;

(vi) any Liability under the Employee Plans or relating to payroll, vacation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit-sharing plans, health care plans or benefits, or any other employee plans or benefits of any kind for Seller's employees or former employees, or both;

(vii) any Liability under any employment, severance, retention or termination agreement with any employee of Seller or any of its Related Persons;

(viii) any Liability arising out of or relating to any employee grievance accruing on or prior to the Closing Date, whether or not the affected employees are hired by Buyer,

(ix) any Liability of Seller to any Shareholder or Related Person of Seller or any Shareholder;

(x) any Liability to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Seller;

(xi) any Liability to distribute to any of Seller's shareholders or otherwise apply all or any part of the consideration received hereunder;

(xii) any Liability arising out of any Proceeding against Seller pending as of the Closing Date, whether or not set forth in the Disclosure Letter;

(xiii)  any Liability arising out of any Proceeding against Seller commenced after the Closing Date and arising out of, or relating to, any occurrence or event happening prior to the Closing Date with respect to Seller's operations or business;

(xiv)  any Liability arising out of or resulting from Seller's non-compliance with any Legal Requirement or Order of any Governmental Body;

(xv)  any Liability of Seller under this Agreement or any other document executed in connection with the Contemplated Transactions; and

(xvi)  any Liability of Seller based upon Seller's acts or omissions occurring after the Closing Date.

### 2.5  ALLOCATION

The Purchase Price shall be allocated in accordance with Schedule 2.5. After the Closing, the parties shall make consistent use of the allocation, fair market value and useful lives specified in Schedule 2.5 for all Tax purposes and in any and all filings, declarations and reports with the IRS in respect thereof, including the reports required to be filed under Section 1060 of the IRC, if applicable, it being understood that Buyer shall prepare and deliver IRS Form 8594 to Seller within forty-five (45) days after the Closing Date if such form is required to be filed with the IRS. In any Proceeding related to the determination of any Tax, none of Buyer, Seller or Shareholders shall contend or represent that such allocation is not a correct allocation.

### 2.6  CLOSING

The purchase and sale (the "Closing") provided for in this Agreement will take place at the offices of Seller at 2840 Liberty Avenue, Suite 100, Pittsburgh, Pennsylvania 15222, at 10:00 a.m. (local time) on March 6, 2008, with an effective date of March 7, 2008 (the "Closing Date").

### 2.7  CLOSING OBLIGATIONS

At the Closing:

(a)  Seller and Malafarina, as the case may be, shall deliver to Buyer:

(i)  a bill of sale for all of the Assets which are tangible personal property in the form of Exhibit 2.7(a)(i) (the "Bill of Sale"), executed by Seller;

(ii)  an assignment of all of the Assumed Contracts and the Assets which are intangible personal property in the form of Exhibit 2.7(a)(ii), which assignment shall also contain Buyer's undertaking and assumption of the Assumed Liabilities (the "Assignment and Assumption Agreement"), executed by Seller;

(iii)    assignments of all Intellectual Property Assets and separate assignments of any registered Marks, Patents and Copyrights, in the form of Exhibit 2.7(a)(iii) executed by Seller;

(iv)    such other deeds, bills of sale, assignments, certificates of title, documents and other instruments of transfer and conveyance as may reasonably be requested by Buyer, each in form and substance satisfactory to Buyer and its legal counsel and executed by Seller;

(v)     escrow agreement in the form of Exhibit 2.7(a)(v), executed by Seller (the "Escrow Agreement");

(vi)    a certificate of the Secretary of Seller certifying, (1) as complete and accurate as of the Closing Date, copies of the Organizational Documents of Seller, (2) that all requisite resolutions or actions of Seller's board of directors and shareholders approving the execution and delivery of this Agreement and any other document relating to the Contemplated Transactions and the consummation of the Completed Transactions have been taken, and (3) as to the incumbency and signatures of the officers of Seller executing this Agreement;

(vii)   the executed application for a Bulk Sale Clearance Certificate to be filed immediately after Closing;

(viii)  the ▮▮▮▮▮▮▮; and

(ix)    an opinion, in the form attached as Exhibit 2.7(a)(xi), from Seller's counsel.

(b)   Buyer shall deliver to Seller:

(i)     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮bank cashier's or certified check payable to the order of, or by wire transfer to an account specified by, Seller, subject to adjustment as set forth in Section 2.8, and less (x) ▮▮▮▮▮▮ and (y) the amount payable to pay off Seller's obligation to PNC Bank.

(ii)    the Escrow Agreement executed by Buyer;

(iii)   the Assignment and Assumption Agreement executed by Buyer; and

(iv)    a certificate of the Secretary of Buyer certifying (1) that all requisite resolutions or actions of Buyer's board of directors approving the execution and delivery of this Agreement any other document relating to

the Contemplated Transactions and the consummation of the Contemplated Transactions have been taken, and (2) as to the incumbency and signatures of the officers of Buyer executing this Agreement.

(c)   Buyer, Seller, the appropriate Key Employees and Key Consultants shall each execute and deliver to the appropriate parties the following:

   (i)   employment agreements in the forms of Exhibit 2.7(c)(i), executed by each of the Key Employees (collectively, the "Employment Agreements");

   (ii)   consulting agreements in the forms of Exhibit 2.7(c)(ii), executed by each of the Key Consultants (collectively, the "Consulting Agreements"); and

   (iii)   noncompetition agreements in the form of Exhibit 2.7(c)(iii), executed by Malafarina and Seller (collectively, the "Noncompetition Agreements").

(d)   Buyer will deliver to UMB Bank, n.a. (the "Escrow Agent") ███████████ ███████████ (the "Escrow Amount") to be held pursuant to the Escrow Agreement.

(e)   Buyer shall pay to ██████ the amount (not to exceed ███████████ .

(f)   Buyer shall wire to PNC Bank the amount (not to exceed ███████████ ████████████ required to satisfy Seller's obligation to said bank and release said bank's security interest in the Assets.

## 2.8   WORKING CAPITAL ADJUSTMENT

The amount of the Purchase Price shall be increased or decreased based upon the amount by which the Working Capital acquired by Buyer as of the Closing Date exceeds or falls short of ███████████ (the "Working Capital Target") and shall be determined pursuant to the procedures set forth in Section 2.9, with the estimated Working Capital adjustment added to or subtracted from the amount due under paragraph (b)(i) of Section 2.7.

## 2.9   ADJUSTMENT PROCEDURE

(a)   Seller and Buyer shall agree, on the Closing Date, of an estimated Working Capital amount for Seller as of the Closing Date which estimated amount shall be used for purposes of estimating the adjustment required under Section 2.8. After Closing, Buyer will cause Buyer's certified public accountants (the "Accountants"), to certify the balance sheet of Seller as of the Closing Date (the "Closing Balance Sheet") and the calculation of Working Capital acquired by Buyer as of the Closing Date. Buyer will deliver the Closing Balance Sheet and such calculation to Seller within sixty days after the Closing Date. If within thirty days following such delivery, Seller has not given Buyer notice of objection to the Closing Balance Sheet and/or such calculation of Working Capital (such notice must contain a statement of the basis of Seller's objection), then the Closing Balance Sheet and such calculation will be used in

computing final adjustments pursuant to Section 2.8. If Seller gives such notice of objection, then the issues in dispute will be submitted to the Accountants for resolution. If issues in dispute are submitted to the Accountants for resolution, (i) each party will furnish to the Accountants such work papers and other documents and information relating to the disputed issues as the Accountants may request and are available to that party (or its independent public accountants), and will be afforded the opportunity to present to the Accountants any material relating to the determination and to discuss the determination with the Accountants; (ii) the determination by the Accountants, as set forth in a notice delivered to both parties by the Accountants, will be binding and conclusive on the parties; and (iii) Buyer and Seller will each bear 50% of the fees of the Accountants for such determination.

(b)      Upon final determination of adjustments under Section 2.8 pursuant to the procedures set forth in paragraph (a) above, any amount due Seller by Buyer, or any amount to be returned to Buyer from Seller shall be immediately due and payable. Buyer shall have the right to offset any amount due from Seller against the amounts payable to Seller under the Escrow Agreement.

(c)      Following the delivery by Buyer of its calculation of the Working Capital acquired by Buyer as of the Closing Date, Buyer shall provide Seller and its representatives reasonable access to the books and records of Seller that were included among the Assets, and any work papers of the Accountants to the extent necessary for Sellers to review and/or evaluate Buyer's calculation of the Working Capital acquired by Buyer as of the Closing Date.

## 2.10   EMPLOYEE MATTERS

(a)



(b)

## 2.11   CONSENTS

(a)      If there are any Material Consents which have not yet been obtained (or otherwise are not in full force and effect) as of the Closing, in the case of each Assumed Contract as to which such Material Consents were not obtained (or otherwise are not in full force and effect) (the "Restricted Material Contracts"), Buyer may waive the closing conditions as to any such Material Consent, and either

    (i)       elect to have Seller continue its efforts to obtain the Material Consents, or

    (ii)      elect to have Seller retain that Restricted Material Contract and all Liabilities arising therefrom or relating thereto.

If Buyer elects to have Seller continue its efforts to obtain any Material Consents and the Closing occurs, notwithstanding Sections 2.1 and 2.4 hereof, neither this Agreement nor the Assignment and Assumption Agreement nor any other document related to the consummation of the Contemplated Transactions shall constitute a sale, assignment, assumption, transfer, conveyance or delivery, or an attempted sale, assignment, assumption, transfer, conveyance or delivery, of the Restricted Material Contracts, and following the Closing, the parties shall use their best efforts, and cooperate with each other, to obtain the Material Consent relating to each Restricted Material Contract as quickly as practicable. Pending the obtaining of such Material Consents relating to any Restricted Material Contract, the parties shall cooperate with each other in any reasonable and lawful arrangements designed to provide to Buyer the benefits of use of the Restricted Material Contract for its term (or any right or benefit arising there under, including the enforcement for the benefit of Buyer of any and all rights of Seller against a third party there under). Once a Material Consent for the sale, assignment, assumption, transfer, conveyance and delivery of a Restricted Material Contract is obtained, Seller shall promptly assign, transfer, convey and deliver such Restricted Material Contract to Buyer, and Buyer shall assume the obligations under such Restricted Material Contract assigned to Buyer from and after the date of assignment to Buyer pursuant to a special-purpose assignment and assumption agreement substantially similar in terms to those of the Assignment and Assumption Agreement (which special-purpose agreement the parties shall prepare, execute and deliver in good faith at the time of such transfer, all at no additional cost to Buyer).

    (b)      If there are any Consents not listed on Schedule 7.3 necessary for the assignment and transfer of any Assumed Contracts to Buyer (the "Non-Material Consents") which have not yet been obtained (or otherwise are not in full force and effect) as of the Closing, Buyer shall elect at the Closing, in the case of each of Assumed Contracts as to which such Non-Material Consents were not obtained (or otherwise are not in full force and effect) (the "Restricted Non-Material Contracts"), whether to

    (i)       accept the assignment of such Restricted Non-Material Contract, in which case, as between Buyer and Seller, such Restricted Non-Material Contract shall, to the maximum extent practicable and notwithstanding the failure to obtain the applicable Non-Material Consent, be transferred at the Closing pursuant to the Assignment and Assumption Agreement as elsewhere provided under this Agreement, or

    (ii)      reject the assignment of such Restricted Non-Material Contract, in which case, notwithstanding Sections 2.1 and 2.4 hereof, (A) neither this Agreement nor the Assignment and Assumption Agreement nor any other document related to the consummation of the Contemplated Transactions shall constitute a sale, assignment, assumption, conveyance or delivery, or an attempted sale, assignment, assumption, transfer, conveyance or

delivery, of such Restricted Non-Material Contract, and (B) Seller shall retain such Restricted Non-Material Contract and all Liabilities arising there from or relating thereto.

## 2.11   COLLECTED OLD RECEIVABLES

After the Closing, Buyer shall pay to Seller the amount of Collected Old Receivables, payable on a monthly basis no later than the 10th of each month for all Collected Old Receivables which are received by Buyer during the prior month.

## 3.   REPRESENTATIONS AND WARRANTIES OF SELLER AND MALAFARINA

As of the date hereof and as of the Closing Date, Seller and Malafarina represent and warrant, jointly and severally, to Buyer as follows:

### 3.1   ORGANIZATION AND GOOD STANDING

(a)     Part 3.1 of the Disclosure Letter contains a complete and accurate list for Seller of its name, its jurisdiction of incorporation, other jurisdictions in which it is authorized to do business. Seller is a corporation duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation, with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under Seller Contracts. Seller is duly qualified to do business as a foreign corporation and is in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification, except to the extent that the failure to be so qualified would not have an adverse effect on the Assets.

(b)     Seller has delivered to Buyer copies of the Organizational Documents of Seller, as currently in effect.

### 3.2   AUTHORITY; NO CONFLICT

(a)     This Agreement constitutes the legal, valid and binding obligation of Seller, enforceable against it in accordance with its terms. Upon the execution and delivery by Seller of the Bill of Sale, the Assignment and Assumption Agreement, and the Escrow Agreement (collectively, the "Seller's Closing Documents"), Seller's Closing Documents will constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms. Seller has the absolute and unrestricted right, power, capacity and authority to execute and deliver this Agreement and Seller's Closing Documents and to perform its obligations under this Agreement and Seller's Closing Documents.

(b)     This Agreement constitutes the legal, valid, and binding obligation of Malafarina, enforceable against him in accordance with its terms. Upon the execution and delivery by Malafarina of the Noncompetition Agreement and his Consulting Agreement (collectively, the

"Malafarina's Closing Documents"), Malafarina's Closing Documents will constitute the legal, valid, and binding obligations of Malafarina, enforceable against Malafarina in accordance with their respective terms. Malafarina has the absolute and unrestricted right, power, authority, and capacity to execute and deliver this Agreement and Malafarina's Closing Documents and to perform his obligations under this Agreement and Malafarina's Closing Documents.

(c)     Except as set forth in Part 3.2 of the Disclosure Letter, neither the execution and delivery of this Agreement nor the consummation or performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time):

(i)     contravene, conflict with, or result in a violation of (A) any provision of the Organizational Documents of Seller, or (B) any resolution adopted by the board of directors or the shareholders of Seller;

(ii)     contravene, conflict with, or result in a violation of, or give any Governmental Body or other Person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under, any Legal Requirement or any Order to which Seller or any Shareholder, or any of the assets owned or used by Seller, may be subject;

(iii)     contravene, conflict with, or result in a violation of any of the terms or requirements of, or give any Governmental Body the right to revoke, withdraw, suspend, cancel, terminate, or modify, any Governmental Authorization that is held by Seller or that otherwise relates to the business of, or any of the assets owned or used by, Seller;

(iv)     to Seller's knowledge, cause Buyer to become subject to, or to become liable for the payment of, any Tax;

(v)     cause any of the Assets to be reassessed or revalued by any taxing authority or other Governmental Body;

(vi)     contravene, conflict with, or result in a violation or breach of any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Assumed Contract; or

(vii)     result in the imposition or creation of any Encumbrance upon or with respect to any of the Assets.

Except as set forth in Part 3.2 of the Disclosure Letter, no Shareholder or Seller is or will be required to give any notice to or obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

### 3.3     CAPITALIZATION

The authorized equity securities of Seller consist of ████ shares of preferred stock and ████ shares of common stock, no par value (the "Common Stock"), of which ████ shares of Common Stock are issued and outstanding. Shareholders are and will be on the Closing Date the record and beneficial owners and holders of all of the issued and outstanding shares of Common Stock, free and clear of all Encumbrances. ████ owns ████ shares of Common Stock and ████ owns ████ shares of Common Stock. All of the outstanding equity securities of Seller have been duly authorized and validly issued and are fully paid and nonassessable. There are no Contracts relating to the issuance, sale, or transfer of any equity securities or other securities of Seller. Seller does not own, nor has any Contract to acquire, any equity securities or other securities of any Person or any direct or indirect equity or ownership interest in any other business.

### 3.4   FINANCIAL STATEMENTS

Seller has delivered to Buyer: (a) audited consolidated balance sheets of Seller as of December 31 in each of the years 2003, 2004 and 2007, and the audited consolidated statements of income, changes in shareholders' equity, and cash flow for each of the fiscal years then ended (the December 31, 2007 audit balance sheet hereinafter the "Balance Sheet"); (b) an internally compared compiled balance sheet of Seller as of December 31, 2005 and 2006, and the related consolidated statements of income, changes in shareholders' equity, and cash flow for the fiscal years then ended; and (c) an unaudited consolidated balance sheet of Seller as of January 31, 2008 (the "Interim Balance Sheet") and the related unaudited consolidated statements of income, changes in shareholders' equity, and cash flow for the one month then ended. Such financial statements fairly present the financial condition and the results of operations, changes in shareholders' equity, and cash flow of Seller as of the respective dates of and for the periods referred to in such financial statements, all in accordance with GAAP, subject, in the case of interim financial statements, to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be materially adverse). The financial statements referred to in this Section 3.4 reflect the consistent application of such accounting principles throughout the periods involved. No financial statements of any Person are required by GAAP to be included in the consolidated financial statements of Seller.

### 3.5   BOOKS AND RECORDS

The books of account, minute books, stock record books, and other records of Seller, all of which have been made available to Buyer, are complete and correct and have been maintained in accordance with sound business practices and all Legal Requirements, including the maintenance of an adequate system of internal controls.

### 3.6   SUFFICIENCY OF ASSETS

Except as set forth in Part 3.6 of the Disclosure Letter, the Assets (a) constitute all of the assets, tangible and intangible, of any nature whatsoever, necessary to operate Seller's business in the manner presently operated by Seller, and (b) include all of the operating assets of Seller.

**3.7**      [intentionally left blank]

**3.8      DESCRIPTION OF OFFICE LEASES**

Part 3.8 of the Disclosure Letter lists the correct street address of all real property in which Seller has a leasehold interest. Seller has delivered to Buyer a complete copy of all Office Leases.

**3.9      TITLE TO ASSETS; ENCUMBRANCES**

Seller owns good and transferable title to all of the Assets free and clear of any Encumbrances other than those described in Part 3.9 of the Disclosure Letter. Seller warrants to Buyer that, at the time of Closing, all the Assets shall be free and clear of all Encumbrances other than those identified on Schedule 3.9 as acceptable to Buyer (the "Permitted Encumbrances").

**3.10      CONDITION OF ASSETS**

Except as disclosed in Part 3.10 of the Disclosure Letter, each item of Tangible Personal Property is in good repair and good operating condition, ordinary wear and tear excepted, and is suitable for immediate use in the Ordinary Course of Business. No item of Tangible Personal Property is in need of repair or replacement other than as part of routine maintenance in the Ordinary Course of Business. Except as disclosed in Part 3.10 of the Disclosure Letter, all Tangible Personal Property used in Seller's business is in the possession of Seller.

**3.11      ACCOUNTS RECEIVABLE**

All Accounts Receivable of Seller that are reflected on the Balance Sheet or the Interim Balance Sheet or on the accounting records of Seller as of the Closing Date represent or will represent valid obligations arising from sales actually made or services actually performed in the Ordinary Course of Business. Unless paid prior to the Closing Date, the Accounts Receivable are or will be as of the Closing Date current and collectible net of the respective reserves shown on the Balance Sheet or the Interim Balance Sheet or on the accounting records of Seller as of the Closing Date (which reserves are adequate and calculated consistent with past practice and, in the case of the reserve as of the Closing Date, will not represent a greater percentage of the Accounts Receivable as of the Closing Date than the reserve reflected in the Interim Balance Sheet represented of the Accounts Receivable reflected therein and will not represent a material adverse change in the composition of such Accounts Receivable in terms of aging). Subject to such reserves, each of the Accounts Receivable either has been or will be collected in full, without any set-off, within ninety days after the day on which it first becomes due and payable. There is no contest, claim, or right of set-off, other than returns in the Ordinary Course of Business, under any Assumed Contract with any obligor of an Accounts Receivable relating to the amount or validity of such Accounts Receivable. Part 3.11 of the Disclosure Letter contains a complete and accurate list of all Accounts Receivable as of the date of the Interim Balance Sheet, which list sets forth the aging of such Accounts Receivable.

**3.12      [intentionally left blank]**

### 3.13   NO UNDISCLOSED LIABILITIES

Except as set forth in Part 3.13 of the Disclosure Letter, Seller has no Liabilities or obligations of any nature except for (a) liabilities or obligations reflected or reserved against in the Balance Sheet or the Interim Balance Sheet, (b) those incurred in connection with this Agreement or the Contemplated Transactions, and (c) and current liabilities incurred in the Ordinary Course of Business since the date of the Interim Balance Sheet.

### 3.14   TAXES

(a)   Seller has filed or caused to be filed (on a timely basis since January 1, 2003) all Tax Returns (such Tax Returns, "Seller's Tax Returns") that are or were required to be filed by or with respect to it, pursuant to applicable Legal Requirements. Seller has delivered to Buyer copies of, and Part 3.14 of the Disclosure Letter contains a complete and accurate list of, all Seller's Tax Returns. Seller has paid, or made provision for the payment of, all Taxes that have or may have become due pursuant to Seller's Tax Returns or otherwise, or pursuant to any assessment received by Shareholders or Seller, except such Taxes, if any, as are listed in Part 3.14 of the Disclosure Letter and are being contested in good faith and as to which adequate reserves (determined in accordance with GAAP) have been provided in the Balance Sheet and the Interim Balance Sheet.

(b)   Part 3.14 of the Disclosure Letter contains a complete and accurate list of all audits of all Seller's Tax Returns, including a reasonably detailed description of the nature and outcome of each audit.

(c)   The charges, accruals, and reserves with respect to Taxes on the respective books of Seller are adequate (determined in accordance with GAAP) and are at least equal to Seller's liability for Taxes as of the date of this Agreement. There exists no proposed tax assessment against Seller except as disclosed in the Balance Sheet or in Part 3.14 of the Disclosure Letter. No consent to the application of Section 341(f)(2) of the IRC has been filed with respect to any property or assets held, acquired, or to be acquired by Seller. All Taxes that Seller is or was required by Legal Requirements to withhold or collect have been duly withheld or collected and, to the extent required, have been paid to the proper Governmental Body or other Person.

(d)   All Seller's Tax Returns filed by Seller are true, correct, and complete. There is no tax sharing agreement that will require any payment by Seller after the date of this

Agreement. Seller is not, nor within the five-year period preceding the Closing Date has been, an "S" corporation.

### 3.15   NO MATERIAL ADVERSE CHANGE

Since the date of the Balance Sheet, there has not been any material adverse change in the business, operations, properties, prospects, assets, or condition of Seller, and no event has occurred or circumstance exists that may result in such a material adverse change; provided, however, that none of the following shall be deemed in themselves, either alone or in combination, to constitute, and that none of the following shall be taken into account in determining whether there has been or will be, a material adverse change (a) any change, event or development attributable to conditions affecting the industry and markets in which the Company operates, the U.S. economy or capital or financial markets generally; (b) changes in Laws after the date hereof; (c) changes in accounting rules after the date hereof; or (d) earthquakes, hostilities, acts of war, sabotage, terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage, terrorism or military actions threatened or underway as of the date hereof.

### 3.16   EMPLOYEE BENEFITS

(a)      As used in this Section 3.16, the following terms have the meanings set forth below:

*"Company Other Benefit Obligation"* – means an Other Benefit Obligation owed, adopted, or followed by Seller or an ERISA Affiliate of Seller.

*"Company Plan"* – means all Plans of which Seller or an ERISA Affiliate of Seller is or was a Plan Sponsor, or to which Seller or an ERISA Affiliate of Seller otherwise contributes or has contributed, or in which Seller or an ERISA Affiliate of Seller otherwise participates or has participated. All references to Plans are to Company Plans unless the context requires otherwise.

*"Company VEBA"* – means a VEBA whose members include employees of Seller or any ERISA Affiliate of Seller.

*"ERISA Affiliate"* – means, with respect to Seller, any other person that, together with Seller, would be treated as a single employer under IRC § 414.

*"Multi-Employer Plan"* – has the meaning given in ERISA § 3(37)(A).

*"Other Benefit Obligations"* – means all obligations, arrangements, or customary practices, whether or not legally enforceable, to provide benefits, other than salary, as compensation for services rendered, to present or former directors, employees, or agents, other than obligations, arrangements, and practices that are Plans. Other Benefit Obligations include consulting agreements under which the compensation paid does not depend upon the amount of service rendered, sabbatical policies, severance payment policies, and fringe benefits within the meaning of IRC § 132.

*"PBGC"* – means the Pension Benefit Guaranty Corporation, or any successor thereto.

*"Pension Plan"* – has the meaning given in ERISA § 3(2)(A).

*"Plan"* – has the meaning given in ERISA § 3(3).

*"Plan Sponsor"* – has the meaning given in ERISA § 3(16)(B).

*"Qualified Plan"* – means any Plan that meets or purports to meet the requirements of IRC § 401(a).

*"Title IV Plans"* – means all Pension Plans that are subject to Title IV of ERISA, 29 U.S.C. § 1301 et seq., other than Multi-Employer Plans.

*"VEBA"* – means a voluntary employees' beneficiary association under IRC § 501(c)(9).

*"Welfare Plan"* – has the meaning given in ERISA § 3(1).

(b)     Part 3.16(b) of the Disclosure Letter contains a complete and accurate list of all Company Plans, Company Other Benefit Obligations, and Company VEBAs, and identifies as such all Company Plans that are (A) defined benefit Pension Plans, (B) Qualified Plans, (C) Title IV Plans, or (D) Multi-Employer Plans.

(c)     Part 3.16(c) of the Disclosure Letter contains a complete and accurate list of (A) all ERISA Affiliates of Seller, and (B) all Plans of which any such ERISA Affiliate is or was a Plan Sponsor, in which any such ERISA Affiliate participates or has participated, or to which any such ERISA Affiliate contributes or has contributed.

(d)     Part 3.16(d) of the Disclosure Letter sets forth a calculation of the liability of Seller for post-retirement benefits other than pensions, made in accordance with Financial Accounting Statement 106 of the Financial Accounting Standards Board, regardless of whether Seller is required by this Statement to disclose such information.

(e)     Part 3.16(e) of the Disclosure Letter sets forth the financial cost of all obligations owed under any Company Plan or Company Other Benefit Obligation that is not subject to the disclosure and reporting requirements of ERISA.

(f)     Seller has delivered to Buyer, or will deliver to Buyer within ten days of the date of this Agreement all documents, agreements, reports, notices and information concerning any Plan disclosed under paragraph (b) above.

(g)     Except as set forth in Part 3.16(g) of the Disclosure Letter:

      (i)     Seller has performed all of their respective obligations under all Company Plans, Company Other Benefit Obligations, and Company VEBAs.

(ii)    Seller, with respect to all Company Plans and Company Other Benefits Obligations, is, and each Company Plan and Company Other Benefit Obligations, is, in full compliance with ERISA, the IRC, and other applicable Laws including the provisions of such Laws expressly mentioned in this Section 3.16.

(iii)   All obligations and liabilities related to all Company Plans and Company Other Benefits Obligations are properly accounted for and reflected in the Balance Sheet and the Interim Balance Sheet, and no claim against, or legal proceeding involving, any Company Plan or Company Other Benefit Obligations is pending or, to Malafarina's Knowledge, is Threatened, other than claims for benefits in the Ordinary Course of Business.

(iv)    Each Qualified Plan of Seller is qualified in form and operation under IRC § 401(a); each trust for each such Plan is exempt from federal income tax under IRC § 501(a). No event has occurred or circumstance exists that will or could give rise to disqualification or loss of tax-exempt status of any such Plan or trust.

(v)     No Company Plan is a VEBA or a Multi-Employer Plan or subject to Title IV of ERISA.

(vi)    No Shareholder or Seller has Knowledge of any facts or circumstances that may give rise to any liability of any Shareholder, Seller, or Buyer to the PBGC under Title IV of ERISA.

(vii)   Neither Seller nor any ERISA Affiliate of Seller has ever established, maintained, or contributed to or otherwise participated in, or had an obligation to maintain, contribute to, or otherwise participate in, any Multi-Employer Plan.

## 3.17   COMPLIANCE WITH LEGAL REQUIREMENTS; GOVERNMENTAL AUTHORIZATIONS

(a)    Except as set forth in Part 3.17 of the Disclosure Letter:

(i)     Seller is, and at all times since January 1, 2004, has been, in full compliance with each Legal Requirement that is or was applicable to it or to the conduct or operation of its business or the ownership or use of any of the Assets;

(ii)    no event has occurred or circumstance exists that (with or without notice or lapse of time) (A) may constitute or result in a violation by Seller of, or a failure on the part of Seller to comply with, any Legal Requirement, or (B) may give rise to any obligation on the part of Seller to undertake, or to

bear all or any portion of the cost of, any remedial action of any nature; and

    (iii)    Seller has not received, at any time since January 1, 2004, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of, or failure to comply with, any Legal Requirement, or (B) any actual, alleged, possible, or potential obligation on the part of Seller to undertake, or to bear all or any portion of the cost of, any remedial action of any nature.

    (b)    Part 3.17 of the Disclosure Letter contains a complete and accurate list of each Governmental Authorization that is held by Seller or that otherwise relates to the business of, or to any of the assets owned or used by, Seller. Each Governmental Authorization listed or required to be listed in Part 3.17 of the Disclosure Letter is valid and in full force and effect. Except as set forth in Part 3.17 of the Disclosure Letter:

    (i)    Seller is, and at all times since January 1, 2004, has been, in full compliance with all of the terms and requirements of each Governmental Authorization identified or required to be identified in Part 3.17 of the Disclosure Letter;

    (ii)    no event has occurred or circumstance exists that may (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a violation of or a failure to comply with any term or requirement of any Governmental Authorization listed or required to be listed in Part 3.17 of the Disclosure Letter, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation, or termination of, or any modification to, any Governmental Authorization listed or required to be listed in Part 3.17 of the Disclosure Letter;

    (iii)    Seller has not received, at any time since January 1, 2004, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding (A) any actual, alleged, possible, or potential violation of or failure to comply with any term or requirement of any Governmental Authorization, or (B) any actual, proposed, possible, or potential revocation, withdrawal, suspension, cancellation, termination of, or modification to any Governmental Authorization; and

    (iv)    all applications required to have been filed for the renewal of the Governmental Authorizations listed or required to be listed in Part 3.17 of the Disclosure Letter have been duly filed on a timely basis with the appropriate Governmental Bodies, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Bodies.

The Governmental Authorizations listed in Part 3.17 of the Disclosure Letter collectively constitute all of the Governmental Authorizations necessary to permit Seller to lawfully conduct and operate its business in the manner it currently conducts and operates such business and to permit Seller to own and use its assets in the manner in which it currently owns and uses such assets.

### 3.18   LEGAL PROCEEDINGS; ORDERS

(a)     Except as set forth in Part 3.18 of the Disclosure Letter, there is no pending Proceeding that:

> (i)     has been commenced by or against Seller or that otherwise relates to or may affect the business of Seller, or any of the Assets; or

> (ii)    challenges, or that may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions.

To the Knowledge of Malafarina and Seller, (1) no such Proceeding has been Threatened, and (2) no event has occurred or circumstance exists that would reasonably be expected to give rise to or serve as a basis for the commencement of any such Proceeding. Seller has delivered to Buyer copies of all pleadings, correspondence, and other documents relating to each Proceeding listed in Part 3.18 of the Disclosure Letter. The Proceedings listed in Part 3.18 of the Disclosure Letter will not have a material adverse effect on the business, operations, assets, condition, or prospects of Seller, ███████████████████████████████

(b)     Except as set forth in Part 3.18 of the Disclosure Letter:

> (i)     there is no Order to which Seller, or any of the assets owned or used by Seller, is subject;

> (ii)    Malafarina is not subject to any Order that relates to the business of, or any of the assets owned or used by, Seller; and

> (iii)   to the Knowledge of Malafarina and Seller, no officer, director, agent, or employee of Seller is subject to any Order that prohibits such officer, director, agent, or employee from engaging in or continuing any conduct, activity, or practice relating to the business of Seller.

(c)     Except as set forth in Part 3.18 of the Disclosure Letter:

> (i)     Seller is, and at all times since January 1, 2004 has been, in full compliance with all of the terms and requirements of each Order to which it, or any of the Assets has been subject;

(ii)   no event has occurred or circumstance exists that may constitute or result in (with or without notice or lapse of time) a violation of or failure to comply with any term or requirement of any Order to which Seller, or any of the Assets is subject; and

(iii)  Seller has not received, at any time since January 1, 2004, any notice or other communication (whether oral or written) from any Governmental Body or any other Person regarding any actual, alleged, possible, or potential violation of, or failure to comply with, any term or requirement of any Order to which Seller, or any of the Assets is or has been subject.

## 3.19   ABSENCE OF CERTAIN CHANGES AND EVENTS

Except as set forth in Part 3.19 of the Disclosure Letter, since the date of the Balance Sheet, Seller has conducted its business only in the Ordinary Course of Business and there has not been any:

(a)   change in Seller's authorized or issued capital stock; grant of any stock option or right to purchase shares of capital stock of Seller or issuance of any security convertible into such capital stock;

(b)   amendment to the Organizational Documents of Seller;

(c)   payment or increase by Seller of any bonuses, salaries, or other compensation to any shareholder, director, officer, or (except in the Ordinary Course of Business) employee or entry into any employment, severance, or similar Contract with any director, officer, or employee;

(d)   adoption of, or increase in the payments to or benefits under, any profit sharing, bonus, deferred compensation, savings, insurance, pension, retirement, or other employee benefit plan for or with any employees of Seller;

(e)   damage to or destruction or loss of any Asset, whether or not covered by insurance;

(f)   entry into, termination of, or receipt of notice of termination of (i) any license, distributorship, dealer, sales representative, joint venture, credit, or similar agreement, or (ii) any Assumed Contract or transaction involving a total remaining commitment by or to Seller of at least ▮▮▮▮▮▮▮▮

(g)   sale (other than sales of inventory in the Ordinary Course of Business), lease, or other disposition of any Asset (including the Intellectual Property Assets) or the creation of any Encumbrance on any Asset;

(h)   cancellation or waiver of any claims or rights with a value to Seller in excess of ▮▮▮▮▮▮▮

(i)    indication by any customer or supplier that is a party to an Assumed Contract or is a current customer or supplier of Seller of an intention to discontinue or change the terms of its relationship with Seller;

(j)    material change in the accounting methods used by Seller;

(k)    change in the scope, focus or type of business of Seller (whether by expansion, contraction, modification or otherwise);

(l)    any other action or inaction not listed above which would be outside the Ordinary Course of Business; or

(m)    agreement, whether oral or written, by Seller to do any of the foregoing.

## 3.20   CONTRACTS; NO DEFAULTS

(a)    Part 3.20(a) of the Disclosure Letter contains a complete and accurate list, and Seller has delivered to Buyer true and complete copies, of:

(i)    each Seller Contract that involves performance of services, extension of credit or delivery of goods or materials by Seller of an amount or value in excess of ███████;

(ii)    each Seller Contract that involves performance of services, extension of credit or delivery of goods or materials to Seller of an amount or value in excess of ███████;

(iii)    each Seller Contract that was not entered into in the Ordinary Course of Business and that involves expenditures or receipts of Seller in excess of ███████;

(iv)    each lease, rental or occupancy agreement, license, installment and conditional sale agreement, and other Seller Contract affecting the ownership of, leasing of, title to, use of, or any leasehold or other interest in, any real or personal property (except personal property leases and installment and conditional sales agreements having a value per item or aggregate payments of less than ███████ and with terms of less than one year);

(v)    each licensing agreement or other Seller Contract with respect to patents, trademarks, copyrights, or other intellectual property, including agreements with current or former employees, consultants, or contractors regarding the appropriation or the non-disclosure of any of the Intellectual Property Assets;

(vi)     each collective bargaining agreement and other Seller Contract to or with any labor union or other employee representative of a group of employees;

(vii)    each joint venture, partnership, and other Seller Contract (however named) involving a sharing of profits, losses, costs, or liabilities by Seller with any other Person;

(viii)   each Seller Contract containing covenants that in any way purport to restrict the business activity of Seller or any Affiliate of Seller or limit the freedom of Seller or any Affiliate of Seller to engage in any line of business or to compete with any Person;

(ix)     each Seller Contract providing for payments to or by any Person based on sales, purchases, or profits, other than direct payments for goods;

(x)      each power of attorney that is currently effective and outstanding;

(xi)     each Seller Contract entered into other than in the Ordinary Course of Business that contains or provides for an express undertaking by Seller to be responsible for consequential, indirect and/or punitive damages;

(xii)    each Seller Contract for capital expenditures in excess of ▮▮▮▮

(xiii)   each written warranty, guaranty, and or other similar undertaking with respect to contractual performance extended by Seller other than in the Ordinary Course of Business; and

(xiv)    each amendment, supplement, and modification (whether oral or written) in respect of any of the foregoing.

Part 3.20(a) of the Disclosure Letter sets forth reasonably complete details concerning such Contracts, including the parties to the Contracts, the amount of the remaining commitment of Seller under the Contracts, and Seller's office where details relating to the Contracts are located.

(b)     Except as set forth in Part 3.20(b) of the Disclosure Letter, each Assumed Contract is in full force and effect and is valid and enforceable in accordance with its terms. To Seller's Knowledge, no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with, or result in a violation or breach of, or give Seller or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or to cancel, terminate, or modify, any Seller Contract.

(c)     Except as set forth in Part 3.20(c) of the Disclosure Letter:

(i)      Seller is, and at all times since January 1, 2004, has been, in compliance with all applicable terms and requirements of each Assumed Contract;

*Page 31*

(ii)     to Seller's Knowledge, each other Person that has or had any obligation or liability under any Assumed Contract is, and at all times since January 1, 2004, has been, in full compliance with all applicable terms and requirements of such Contract;

(iii)     no event has occurred or circumstance exists that (with or without notice or lapse of time) may contravene, conflict with or result in a Breach of, or give Seller or other Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any Assumed Contract;

(iv)     no event has occurred or circumstance exists under or by virtue of any Contract that (with or without notice or lapse of time) would cause the creation of any Encumbrance affecting any of the Assets; and

(v)     Seller has not given to or received from any other Person, at any time since January 1, 2004 any notice or other communication (whether oral or written) regarding any actual, alleged, possible or potential violation or Breach of, or default under, any Assumed Contract.

**(d)**     There are no renegotiations of, attempts to renegotiate or outstanding rights to renegotiate any material amounts paid or payable to Seller under any Assumed Contract with any Person having the contractual or statutory right to demand or require such renegotiation and no such Person has made written demand for such renegotiation.

### 3.21   INSURANCE

**(a)**     Seller has delivered to Buyer:

(i)     true and complete copies of all policies of insurance to which Seller is a party or under which Seller, or any director of Seller, is or has been covered at any time within the two years preceding the date of this Agreement; and

(ii)     true and complete copies of all pending applications for policies of insurance.

**(b)**     Part 3.21(b) of the Disclosure Letter describes:

(i)     any self-insurance arrangement by or affecting Seller, including any reserves established thereunder;

(ii)     any contract or arrangement, other than a policy of insurance, for the transfer or sharing of any risk by Seller; and

(iii)    all obligations of Seller to third parties with respect to insurance (including such obligations under leases and service agreements) and identifies the policy under which such coverage is provided.

(c)    Part 3.21(c) of the Disclosure Letter sets forth, by year, for the current policy year and each of the two (2) preceding policy years a summary of the loss experience under each policy.

(d)    Except as set forth on Part 3.21(d) of the Disclosure Letter, all policies to which Seller is a party or that provide coverage to Seller, Shareholders, or any director or officer of Seller:

(i)    are valid, outstanding, and enforceable;

(ii)    are issued by an insurer that is financially sound and reputable;

(iii)    taken together, provide adequate insurance coverage for the assets and the operations of Seller for all risks to which Seller is normally exposed;

(iv)    are sufficient for compliance with all Legal Requirements and Contracts to which Seller is a party or by which it is bound;

(v)    will continue in full force and effect following the consummation of the Contemplated Transactions; and

(vi)    do not provide for any retrospective premium adjustment or other experienced-based liability on the part of Seller.

## 3.22    ENVIRONMENTAL MATTERS

Except as set forth in Part 3.22 of the Disclosure Letter:

(a)    Seller is, and at all times has been, in full compliance with, and has not been and is not in violation of or liable under, any Environmental Law. Neither Malafarina nor Seller has any basis to expect, nor has any of them or any other Person for whose conduct they are or may be held to be responsible received, any actual or Threatened order, notice, or other communication from (i) any Governmental Body or private citizen acting in the public interest, or (ii) the current or prior owner or operator of any Facilities, of any actual or potential violation or failure to comply with any Environmental Law, or of any actual or Threatened obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Seller has had an interest, or with respect to any property or Facility at or to which Hazardous Materials were generated, manufactured, refined, transferred, imported, used, or processed by Seller or any other Person for whose conduct Seller may be held responsible, or from which Hazardous Materials have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

*Page 33*

(b)     There are no pending or, to the Knowledge of Malafarina and Seller, Threatened claims, Encumbrances, or other restrictions of any nature, resulting from any Environmental, Health, and Safety Liabilities or arising under or pursuant to any Environmental Law, with respect to or affecting any of the Facilities or any other properties and assets (whether real, personal, or mixed) in which Shareholders or Seller has or had an interest.

(c)     Neither Malafarina nor Seller has Knowledge of any basis to expect, nor has either of them or any other Person for whose conduct Seller may be held responsible, received, any citation, directive, inquiry, notice, Order, summons, warning, or other communication that relates to Hazardous Activity, Hazardous Materials, or any alleged, actual, or potential violation or failure to comply with any Environmental Law, or of any alleged, actual, or potential obligation to undertake or bear the cost of any Environmental, Health, and Safety Liabilities with respect to any of the Facilities or any other properties or assets (whether real, personal, or mixed) in which Seller had an interest, or with respect to any property or facility to which Hazardous Materials generated, manufactured, refined, transferred, imported, used, or processed by Seller, or any other Person for whose conduct Seller may be held responsible, have been transported, treated, stored, handled, transferred, disposed, recycled, or received.

(d)     Neither Malafarina nor Seller, or any other Person for whose conduct Seller may be held responsible, has any Environmental, Health, and Safety Liabilities with respect to the Facilities or, to the Knowledge of Malafarina and Seller, with respect to any other properties and assets (whether real, personal, or mixed) in which Seller (or any predecessor), has or had an interest, or at any property geologically or hydrologically adjoining the Facilities or any such other property or assets.

(e)     To Seller's and Malafarina's Knowledge, there are no Hazardous Materials present on or in the Environment at the Facilities or at any geologically or hydrologically adjoining property, including any Hazardous Materials contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Facilities or such adjoining property, or incorporated into any structure therein or thereon. Neither Malafarina nor Seller, or any other Person for whose conduct Seller may be held responsible, or to the Knowledge of Malafarina and Seller, any other Person, has permitted or conducted, or is aware of, any Hazardous Activity conducted with respect to the Facilities or any other properties or assets (whether real, personal, or mixed) in which Seller has or had an interest.

(f)     To the Knowledge of Malafarina and Seller, there has been no Release, Threat of Release, of any Hazardous Materials at or from the Facilities or at any other locations where any Hazardous Materials were generated, manufactured, refined, transferred, produced, imported, used, or processed from or by the Facilities, or from or by any other properties and assets (whether real, personal, or mixed) in which Seller has or had an interest, or to the Knowledge of Malafarina and Seller any geologically or hydrologically adjoining property, whether by Malafarina, Seller, or any other Person.

(g)     Seller has delivered to Buyer true and complete copies and results of any reports, studies, analyses, tests, or monitoring possessed or initiated by Seller pertaining to Hazardous Materials or Hazardous Activities in, on, or under the Facilities, or concerning compliance by Seller, or any other Person for whose conduct Seller may be held responsible, with Environmental Laws.

### 3.23   EMPLOYEES

(a)     Part 3.23 of the Disclosure Letter contains a complete and accurate list of the following information for each employee or director of Seller, including each employee on leave of absence or layoff status: employer; name; job title; current compensation paid or payable and any change in compensation since January 1, 2004; vacation accrued; and service credited for purposes of vesting and eligibility to participate under Seller's pension, retirement, profit-sharing, thrift-savings, deferred compensation, stock bonus, stock option, cash bonus, employee stock ownership (including investment credit or payroll stock ownership), severance pay, insurance, medical, welfare, or vacation plan, other Employee Pension Benefit Plan or Employee Welfare Benefit Plan, or any other employee benefit plan or any director benefit plan.

(b)     No employee or director of Seller is a party to, or is otherwise bound by, any agreement or arrangement, including any confidentiality, noncompetition, or proprietary rights agreement, between such employee or director and any other Person ("Proprietary Rights Agreement") that in any way adversely affects or will affect (i) the performance of his duties as an employee or director of Seller, or (ii) the ability of Seller to conduct its business, including any Proprietary Rights Agreement with Seller or any Shareholder. To Malafarina's and Seller's Knowledge, no director, officer, or other key employee of Seller intends to terminate his employment with Seller.

(c)     Part 3.23 of the Disclosure Letter also contains a complete and accurate list of the following information for each retired employee or director of Seller, or their dependents, receiving benefits or scheduled to receive benefits in the future: name, pension benefit, pension option election, retiree medical insurance coverage, retiree life insurance coverage, and other benefits.

### 3.24   LABOR RELATIONS; COMPLIANCE

Since January 1, 2004, Seller has not been nor is it a party to any collective bargaining or other labor Contract. Since January 1, 2004, there has not been, there is not presently pending or existing, and to Seller's and Malafarina's Knowledge there is not Threatened, (a) any strike, slowdown, picketing, work stoppage, or employee grievance process, (b) any Proceeding against or affecting Seller relating to the alleged violation of any Legal Requirement pertaining to labor relations or employment matters, including any charge or complaint filed by an employee or union with the National Labor Relations Board, the Equal Employment Opportunity Commission, or any comparable Governmental Body, organizational activity, or other labor or employment dispute against or affecting Seller or its premises, or (c) any application for certification of a collective bargaining agent. To Seller's and Malafarina's Knowledge no event has occurred or circumstance exists that could provide the basis for any work stoppage or other

labor dispute. There is no lockout of any employees by Seller, and no such action is contemplated by Seller. Except as set forth in Part 3.24 of the Disclosure Letter, Seller has complied in all respects with all Legal Requirements relating to employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar taxes, occupational safety and health, and plant closing. Except as set forth in Section 3.24 of the Disclosure Letter, Seller is not liable for the payment of any compensation, damages, taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing Legal Requirements.

### 3.25   INTELLECTUAL PROPERTY

(a)   *Intellectual Property Assets* – The term "Intellectual Property Assets" includes:

   (i)   Seller's name, all fictional business names, trading names, registered and unregistered trademarks, service marks, and applications (collectively, "Marks");

   (ii)   all patents, patent applications, and inventions and discoveries that may be patentable (collectively, "Patents");

   (iii)   all copyrights in both published works and unpublished works (collectively, "Copyrights");

   (iv)   all rights in mask works (collectively, "Rights in Mask Works"); and

   (v)   all know-how, trade secrets, confidential information, customer lists, software, technical information, data, process technology, plans, drawings, and blue prints (collectively, "Trade Secrets"); owned, used, or licensed by Seller as licensee or licensor.

(b)   *Agreements* – Part 3.25(b) of the Disclosure Letter contains a complete and accurate list and summary description, including any royalties paid or received by Seller, of all Contracts relating to the Intellectual Property Assets to which Seller is a party or by which Seller is bound, except for any license implied by the sale of a product and perpetual, paid-up licenses for commonly available software programs with a value of less than ▓▓▓▓ under which Seller is the licensee. There are no outstanding and, to Seller's and Shareholders' Knowledge, no Threatened disputes or disagreements with respect to any such agreement.

(c)   *Know-How Necessary for the Business*

   (i)   The Intellectual Property Assets are all those necessary for the operation of Seller's business as it is currently conducted. Seller is the owner or licensee of all right, title, and interest in and to each of the Intellectual Property Assets, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims, and except as otherwise

set forth in Part 3.25(c) of the Disclosure Letter, has the right to use without payment to a third party all of the Intellectual Property Assets.

(ii)    Except as set forth in Part 3.25(c) of the Disclosure Letter, all former and current employees of Seller have executed written Contracts with Seller that assign to Seller all rights to any inventions, improvements, discoveries, or information relating to the business of Seller. No employee of Seller has entered into any Contract that restricts or limits in any way the scope or type of work in which the employee may be engaged or requires the employee to transfer, assign, or disclose information concerning his work to anyone other than Seller.

(d)    *Patents*

(i)     Part 3.25(d) of the Disclosure Letter contains a complete and accurate list and summary description of all Patents. Seller is the owner of all right, title, and interest in and to each of the Patents, free and clear of all liens, security interests, charges, encumbrances, entities, and other adverse claims.

(ii)    All of the issued Patents are currently in compliance with formal legal requirements (including payment of filing, examination, and maintenance fees and proofs of working or use), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)   No Patent has been or is now involved in any interference, reissue, reexamination, or opposition proceeding. To Seller's and Malafarina's Knowledge, there is no potentially interfering patent or patent application of any third party.

(iv)    No Patent is infringed or, to Seller's and Malafarina's Knowledge, has been challenged or threatened in any way. None of the products manufactured and sold, nor any process or know-how used, by Seller infringes or is alleged to infringe any patent or other proprietary right of any other Person.

(v)     All products made, used, or sold under the Patents have been marked with the proper patent notice.

(e)    *Trademarks*

(i)     Part 3.25(e) of Disclosure Letter contains a complete and accurate list and summary description of all Marks. Seller is the owner of all right, title, and interest in and to each of the Marks, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)   All Marks that have been registered with the United States Patent and Trademark Office are currently in compliance with all formal legal requirements (including the timely post-registration filing of affidavits of use and incontestability and renewal applications), are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the Closing Date.

(iii)   No Mark has been or is now involved in any opposition, invalidation, or cancellation and, to Seller's and Malafarina's Knowledge, no such action is Threatened with the respect to any of the Marks.

(iv)   To Seller's and Malafarina's Knowledge, there is no potentially interfering trademark or trademark application of any third party.

(v)   No Mark is infringed or, to Seller's and Malafarina's Knowledge, has been challenged or threatened in any way. None of the Marks used by Seller infringes or is alleged to infringe any trade name, trademark, or service mark of any third party.

(vi)   All products and materials containing a federally-registered Mark bear the proper federal registration notice where permitted by law.

(f)   *Copyrights*

(i)   Part 3.25(f) of the Disclosure Letter contains a complete and accurate list and summary description of all registered Copyrights. Seller is the owner of all right, title, and interest in and to each of the registered Copyrights, free and clear of all liens, security interests, charges, encumbrances, equities, and other adverse claims.

(ii)   All the registered Copyrights have been registered and are currently in compliance with formal legal requirements, are valid and enforceable, and are not subject to any maintenance fees or taxes or actions falling due within ninety days after the date of Closing.

(iii)   No Copyright is infringed or, to Seller's and Malafarina's Knowledge, has been challenged or threatened in any way. None of the subject matter of any of the Copyrights infringes or is alleged to infringe any copyright of any third party or is an unauthorized derivative work based on the work of a third party.

(iv)   All works encompassed by the Copyrights have been marked with the proper copyright notice.

(g)   *Trade Secrets*

(i)     With respect to each Trade Secret, the documentation relating to such Trade Secret is current, accurate, and sufficient in detail and content to identify and explain it and to allow its full and proper use without reliance on the knowledge or memory of any individual.

(ii)    Shareholders and Seller have taken all reasonable precautions to protect the secrecy, confidentiality, and value of Seller's Trade Secrets.

(iii)   Seller has good title and an absolute (but not necessarily exclusive) right to use the Trade Secrets. The Trade Secrets are not part of the public knowledge or literature, and, to Seller's and Malafarina's Knowledge, have not been used, divulged, or appropriated either for the benefit of any Person (other than Seller) or to the detriment of Seller. No Trade Secret is subject to any adverse claim or has been challenged or threatened in any way.

## 3.26   CERTAIN PAYMENTS

Since January 1, 2004, neither Seller nor any director, officer, agent, or employee of Seller, or to Seller's and Malafarina's Knowledge any other Person associated with or acting for or on behalf of Seller, has directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kickback, or other payment to any Person, private or public, regardless of form, whether in money, property, or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of Seller or any Affiliate of Seller, or (iv) in violation of any Legal Requirement, or (b) established or maintained any fund or asset that has not been recorded in the books and records of Seller.

## 3.27   DISCLOSURE

(a)     No representation or warranty of Shareholders or Seller in this Agreement and no statement in the Disclosure Letter omits to state a material fact necessary to make the statements herein or therein, in light of the circumstances in which they were made, not misleading.

(b)     No notice given pursuant to Section 5.5 will contain any untrue statement or omit to state a material fact necessary to make the statements therein or in this Agreement, in light of the circumstances in which they were made, not misleading.

(c)     There is no fact known to Malafarina or Seller that has specific application to Seller (other than general economic or industry conditions) and that materially adversely affects or, as far as Malafarina or Seller can reasonably foresee, materially threatens, the assets, business, prospects, financial condition, or results of operations of Seller that has not been set forth in this Agreement or the Disclosure Letter.

### 3.28   RELATIONSHIPS WITH RELATED PERSONS

No Shareholder or any Related Person of any Shareholder or of Seller has, or since the first day of the next to last completed fiscal year of Seller has had, any interest in any property (whether real, personal, or mixed and whether tangible or intangible) used in or pertaining to Seller's business. No Shareholder or any Related Person of any Shareholder or of Seller has, or since the first day of the next to last completed fiscal year of Seller has had (of record or as a beneficial owner), an equity interest or any other financial or profit interest in a Person that has (a) had business dealings or a material financial interest in any transaction with Seller other than business dealings or transactions conducted in the Ordinary Course of Business with Seller at substantially prevailing prices and on substantially prevailing market terms, or (b) engaged in competition with Seller with respect to any line of the products or services of Seller (a "Competing Business") in any market presently served by Seller except for less than one percent of the outstanding capital stock of any Competing Business that is publicly traded on any recognized exchange or in the over-the-counter market. Except as set forth in Part 3.28 of the Disclosure Letter, no Shareholder or any Related Person of any Shareholder or of Seller is a party to any Contract with, or has any claim or right against, Seller.

### 3.29   BROKERS OR FINDERS

Except with respect to Agency Management Group Enterprises, Inc. (for which Seller has sole responsibility), neither Seller nor any of its officers, directors, employees or agents have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fee or agents' commissions or other similar payment in connection with the sale of Seller's business or the Assets or the Contemplated Transactions.

### 4.   REPRESENTATIONS AND WARRANTIES OF BUYER

As of the date hereof and as of the Closing Date, Buyer represents and warrants to Seller as follows:

### 4.1   ORGANIZATION AND GOOD STANDING

Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the State of Missouri.

### 4.2   AUTHORITY; NO CONFLICT

(a)   This Agreement constitutes the legal, valid, and binding obligation of Buyer, enforceable against Buyer in accordance with its terms. Upon the execution and delivery by Buyer of the Noncompetition Agreements, the Employment Agreements, the Assignment and Assumption Agreement, and the Escrow Agreement (collectively, the "Buyer's Closing Documents"), Buyer's Closing Documents will constitute the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms. Buyer has the absolute and unrestricted right, power, and authority to execute and deliver this

Agreement and Buyer's Closing Documents and to perform its obligations under this Agreement and Buyer's Closing Documents.

(b)     Neither the execution and delivery of this Agreement by Buyer nor the consummation or performance of any of the Contemplated Transactions by Buyer will give any Person the right to prevent, delay, or otherwise interfere with any of the Contemplated Transactions pursuant to:

      (i)     any provision of Buyer's Organizational Documents;

      (ii)    any resolution adopted by the board of directors or the shareholders of Buyer;

      (iii)   any Legal Requirement or Order to which Buyer may be subject; or

      (iv)    any Contract to which Buyer is a party or by which Buyer may be bound.

Buyer is not and will not be required to obtain any Consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the Contemplated Transactions.

**4.3     CERTAIN PROCEEDINGS**

There is no pending Proceeding that has been commenced against Buyer and that challenges, or may have the effect of preventing, delaying, making illegal, or otherwise interfering with, any of the Contemplated Transactions. To Buyer's Knowledge, no such Proceeding has been Threatened.

**4.4     BROKERS OR FINDERS**

Buyer and its officers and agents have incurred no obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement and will indemnify and hold Seller and Shareholders harmless from any such payment alleged to be due by or through Buyer as a result of the action of Buyer or its officers or agents.

**5.     COVENANTS OF SELLER AND MALAFARINA**

**5.1     CHANGE OF NAME**

On or as soon as reasonably practical after the Closing Date, Seller shall (a) amend its Governing Documents and take all other actions necessary to change its name to one sufficiently dissimilar to Seller's present name, in Buyer's judgment, to avoid confusion; and (b) take all actions requested by Buyer to enable Buyer to use Seller's present name, if it desires to do so.

## 5.2   PAYMENT OF LIABILITIES

Seller shall pay or otherwise satisfy in the Ordinary Course of Business all of its liabilities and obligations. Buyer and Seller hereby waive compliance with the bulk transfer provisions of the Uniform Commercial Code (or any similar law) ("Bulk Sales Laws") in connection with the Contemplated Transactions; except that immediately after the Closing Seller shall apply for a Bulk Clearance Certificate with the Pennsylvania Department of Revenue and the Pennsylvania Department of Labor and Industry, Office of Unemployment Compensation Tax Services, e-Government Unit, and Seller shall deliver a Bulk Sale Clearance Certificate from such Pennsylvania government departments which releases Buyer from any liability for Taxes or other obligations owed by Seller to the State of Pennsylvania (the "Bulk Sale Clearance Certificate") as soon as possible after the Closing.

## 5.3   ████████████

██████████████████████████████████████
███████

## 6.   [INTENTIONALLY LEFT BLANK].

## 7.   CONDITIONS PRECEDENT TO BUYER'S OBLIGATION TO CLOSE

Buyer's obligation to purchase the Assets and to take the other actions required to be taken by Buyer at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Buyer, in whole or in part):

## 7.1   ACCURACY OF REPRESENTATIONS

All of Seller's and Malafarina's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement, and must be accurate in all material respects as of the Closing Date as if made on the Closing Date, without giving effect to any supplement to the Disclosure Letter.

## 7.2   SELLER'S AND MALAFARINA'S PERFORMANCE

(a)   All of the covenants and obligations that Seller and Shareholders are required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been duly performed and complied with in all material respects.

(b)   Each document required to be delivered pursuant to Section 2.7 must have been delivered, and each of the other covenants and obligations in Section 5 must have been performed and complied with in all respects.

### 7.3  CONSENTS

Each of the Consents identified in Part 3.2 of the Disclosure Letter, and each Consent identified on Schedule 7.3 (collectively, the "Material Consents") must have been obtained and must be in full force and effect.

### 7.4  DUE DILIGENCE

Buyer shall be satisfied as to the results of its due diligence investigation of Seller, including Seller's business, its financial condition, prospects, legal matters and personnel, and the 2007 Audit.

### 7.5  FAIRNESS OPINION

Buyer shall have received an opinion from the independent fiduciary of the ESOP, that this Agreement and the Contemplated Transactions are fair to the participants of the ESOP, such opinion to be in form and substance acceptable to Buyer.

### 7.6  ADDITIONAL DOCUMENTS

Each of the following documents must have been delivered to Buyer:

(a)     estoppel certificate executed by each landlord of the Office Leases dated as of a date not more than ten (10) days prior to the Closing Date, in the form of Exhibit 7.6(a);

(b)     such other documents as Buyer may reasonably request for the purpose of (i) evidencing the accuracy of any of Seller's or Malafarina's representations and warranties, (ii) evidencing the performance by Seller or Malafarina, as the case may be, of, or the compliance by Seller or Shareholders with, any covenant or obligation required to be performed or complied with by such Person, (iii) evidencing the satisfaction of any condition referred to in this Section 7, or (iv) otherwise facilitating the consummation or performance of any of the Contemplated Transactions; and

(c)     Releases of all Encumbrances on the Assets, other than the Permitted Encumbrances.

### 7.7  NO PROCEEDINGS

There must not have been commenced or Threatened against Buyer, or against any Person affiliated with Buyer, any Proceeding (a) involving any challenge to, or seeking damages or other relief in connection with, any of the Contemplated Transactions, or (b) that may have the effect of preventing, delaying, making illegal, or otherwise interfering with any of the Contemplated Transactions.

### 7.8   NO PROHIBITION

Neither the consummation nor the performance of any of the Contemplated Transactions will, directly or indirectly (with or without notice or lapse of time), materially contravene, or conflict with, or result in a material violation of, or cause Buyer or any Person affiliated with Buyer to suffer any material adverse consequence under, (a) any Seller Legal Requirement or Order, or (b) any Legal Requirement or Order that has been published, introduced, or otherwise proposed by or before any Governmental Body.

### 7.9 ███████████████

At or before closing, Seller shall have ██████████████████████████████████████ ███████████████████████████████████████████. At Closing, Buyer shall have received from all Continuing Employees its standard Confidentiality and Non-Piracy Agreement, which agreement shall include a release, in form and substance satisfactory to Buyer, that all Continuing Employees release and hold harmless Barkley from any and all Liabilities related to any claims, causes of action or rights that Continuing Employees have against Seller.

### 7.10   NO MATERIAL ADVERSE CHANGE

No material adverse change shall have occurred with respect to Seller, its business, financial condition, or prospects, or the Assets.

### 8.   CONDITIONS PRECEDENT TO SELLER'S OBLIGATION TO CLOSE

Seller's obligation to sell the Assets and to take the other actions required to be taken by Seller at the Closing is subject to the satisfaction, at or prior to the Closing, of each of the following conditions (any of which may be waived by Seller, in whole or in part):

### 8.1   ACCURACY OF REPRESENTATIONS

All of Buyer's representations and warranties in this Agreement (considered collectively), and each of these representations and warranties (considered individually), must have been accurate in all material respects as of the date of this Agreement and must be accurate in all material respects as of the Closing Date as if made on the Closing Date.

### 8.2   BUYER'S PERFORMANCE

(a)   All of the covenants and obligations that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing (considered collectively), and each of these covenants and obligations (considered individually), must have been performed and complied with in all material respects.

(b)   Buyer must have delivered each of the documents required to be delivered by Buyer pursuant to Section 2.7 and must have made the cash payments required to be made by Buyer pursuant to Section 2.7(b)(i).

### 8.3   CONSENTS

Each of the Consents identified in Part 3.2 of the Disclosure Letter must have been obtained and must be in full force and effect.

### 8.4   ADDITIONAL DOCUMENTS

Buyer must have caused the following documents to be delivered to Seller, if Seller has a reasonable basis to request such documents:

(a)   documents evidencing the accuracy of any representation or warranty of Buyer;

(b)   documents evidencing the performance by Buyer of, or the compliance by Buyer with, any covenant or obligation required to be performed or complied with by Buyer;

(c)   documents evidencing the satisfaction of any condition referred to in this Section 8; or

(d)   documents otherwise facilitating the consummation of any of the Contemplated Transactions.

### 9.   TERMINATION

### 9.1   TERMINATION EVENTS

This Agreement may, by notice given prior to or at the Closing, be terminated:

(a)   by either Buyer or Seller if a material Breach of any provision of this Agreement has been committed by the other party and such Breach has not been waived;

(b)   (i) by Buyer if any of the conditions in Section 7 has not been satisfied as of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) and Buyer has not waived such condition on or before the Closing Date; or (ii) by Seller, if any of the conditions in Section 8 has not been satisfied of the Closing Date or if satisfaction of such a condition is or becomes impossible (other than through the failure of Seller to comply with its obligations under this Agreement) and Seller has not waived such condition on or before the Closing Date;

(c)   by mutual written consent of Buyer, Seller and Malafarina; or

(d)   by either Buyer or Seller if the Closing has not occurred (other than through the failure of any party seeking to terminate this Agreement to comply fully with its obligations under this Agreement) on or before March 7, 2008, or such later date as the parties may agree upon.

## 9.2   EFFECT OF TERMINATION

Each party's right of termination under Section 9.1 is in addition to any other rights it may have under this Agreement or otherwise, and the exercise of a right of termination will not be an election of remedies. If this Agreement is terminated pursuant to Section 9.1, all further obligations of the parties under this Agreement will terminate, except that the obligations in Sections 11.1 and 11.3 will survive; provided, however, that if this Agreement is terminated by a party because of the Breach of the Agreement by the other party or because one or more of the conditions to the terminating party's obligations under this Agreement is not satisfied as a result of the other party's failure to comply with its obligations under this Agreement, the terminating party's right to pursue all legal remedies will survive such termination unimpaired.

## 10.   INDEMNIFICATION; REMEDIES

## 10.1   SURVIVAL; RIGHT TO INDEMNIFICATION NOT AFFECTED BY KNOWLEDGE

All representations, warranties, covenants, and obligations in this Agreement, the Disclosure Letter, the supplements to the Disclosure Letter, the certificates delivered pursuant to Section 2.7, and any other certificate or document delivered pursuant to this Agreement will survive the Closing for a period of five (5) years. The right to indemnification, payment of Damages or other remedy based on such representations, warranties, covenants, and obligations will not be affected by any investigation conducted with respect to, or any Knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing Date, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or obligation; unless prior to the Closing Date Buyer's Directors, Chief Executive Officer, President or Chief Operating Officer have actual specific knowledge of any breach by Seller under this Agreement (or willfully avoided obtaining such knowledge from officers of Buyer) and fail to notify Seller of such breach. The waiver of any condition based on the accuracy of any representation or warranty, or on the performance of or compliance with any covenant or obligation, will not affect the right to indemnification, payment of Damages, or other remedy based on such representations, warranties, covenants, and obligations.

## 10.2   INDEMNIFICATION AND PAYMENT OF DAMAGES BY MALAFARINA AND SELLER

Seller and Malafarina, jointly and severally, will indemnify and hold harmless Buyer and its Representatives, shareholders, controlling persons, and affiliates (collectively, the "Indemnified Persons") for, and will pay to the Indemnified Persons the amount of, any loss,

liability, claim, damage (including incidental and consequential damages), expense (including costs of investigation and defense and reasonable attorneys' fees) or diminution of value, whether or not involving a third-party claim (collectively, "Damages"), arising, directly or indirectly, from or in connection with:

(a) any Breach of any representation or warranty made by Seller or Malafarina in this Agreement (without giving effect to any supplement to the Disclosure Letter), the Disclosure Letter, the supplements to the Disclosure Letter, or any other certificate or document delivered by Seller or Malafarina pursuant to this Agreement;

(b) any Breach of any representation or warranty made by Seller or Malafarina in this Agreement as if such representation or warranty were made on and as of the Closing Date without giving effect to any supplement to the Disclosure Letter, other than any such Breach that is disclosed in a supplement to the Disclosure Letter and is expressly identified in the certificate delivered pursuant to Section 2.7(a)(vii) as having caused the condition specified in Section 7.1 not to be satisfied;

(c) any Breach by Seller or Malafarina of any covenant or obligation in this Agreement;

(d) any product shipped or manufactured by, or any services or credit facility provided by, Seller prior to the Closing Date;

(e) any matter disclosed in Parts 3.14, 3.17(a), 3.18(a) and (b) and 3.24 of the Disclosure Letter;

(f) any failure of Seller to send an IRS Form 1099 to any required recipient;

(g) any trade account payable of Seller which is not reflected on the Interim Balance Sheet and which is also not included in the final calculation of Working Capital pursuant to Section 2.9;

(h) any liability for the following Assumed Contracts for which a consent for the assignment of such contract is not obtained at Closing and (i) which are subsequently cancelled or terminated by such third party and Barkley is required to pay any damages or liability related to such termination, or (ii) Barkley is required to pay any fee or payment to such third party in order to obtain such consent: 24.7 Media – PA Ad Services, and SiverPop Target Email Services; or

(i) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by any such Person with Seller or Malafarina (or any Person acting on their behalf) in connection with any of the Contemplated Transactions.

The remedies provided in this Section 10.2 will not be exclusive of or limit any other remedies that may be available to Buyer or the other Indemnified Persons. Any and all indemnification payments under this Section 10.2 shall be deemed adjustments to the Purchase Price.

### 10.3   INDEMNIFICATION AND PAYMENT OF DAMAGES BY BUYER

Buyer will indemnify and hold harmless Seller, and will pay to Seller the amount of any Damages arising, directly or indirectly, from or in connection with (a) any Breach of any representation or warranty made by Buyer in this Agreement or in any certificate delivered by Buyer pursuant to this Agreement, (b) any Breach by Buyer of any covenant or obligation of Buyer in this Agreement, or (c) any claim by any Person for brokerage or finder's fees or commissions or similar payments based upon any agreement or understanding alleged to have been made by such Person with Buyer (or any Person acting on its behalf) in connection with any of the Contemplated Transactions.

### 10.4   LIMITATIONS ON AMOUNT – SELLER AND MALAFARINA

Seller and Malafarina will have no liability (for indemnification or otherwise) with respect to the matters described in clause (a) or clause (b) of Section 10.2 until the total of all Damages with respect to such matters exceeds          and then only for the amount by which such Damages exceed (          ) However, this Section 10.4 will not apply to any Breach of any of Seller's and Malafarina's representations and warranties of which Seller or Malafarina had actual knowledge at any time prior to the date on which such representation and warranty is made or any intentional Breach by Seller or Malafarina of any covenant or obligation, and Seller and Malafarina will be liable for all Damages with respect to such Breaches.

### 10.5   LIMITATIONS ON AMOUNT – BUYER

Buyer will have no liability (for indemnification or otherwise) with respect to the matters described in clause (a) or (b) of Section 10.3 until the total of all Damages with respect to such matters exceeds         , and then only for the amount by which such Damages exceed          However, this Section 10.5 will not apply to any Breach of any of Buyer's representations and warranties of which Buyer had Knowledge at any time prior to the date on which such representation and warranty is made or any intentional Breach by Buyer of any covenant or obligation, and Buyer will be liable for all Damages with respect to such Breaches.

### 10.6   RIGHT OF SET-OFF

Subject to the provisions of Section 10.7 concerning third-party claims, upon notice to Seller specifying in reasonable detail the basis for such set-off, Buyer may set off any amount to which it may be entitled under this Section 10 against amounts otherwise payable under the Escrow Amount. The exercise of such right of set-off by Buyer in good faith, whether or not ultimately determined to be justified, will not constitute an event of default under this Agreement. Neither the exercise of nor the failure to exercise such right of set-off will constitute an election of remedies or limit Buyer in any manner in the enforcement of any other remedies

that may be available to it. Buyer shall exercise its rights to make claims under the Escrow Agreement and recover amounts due from the Escrow Amount before it seeks to recover amounts from Malafarina.

## 10.7 PROCEDURE FOR INDEMNIFICATION – THIRD-PARTY CLAIMS

(a)     Promptly after receipt by an indemnified party under Section 10.2 or Section 10.3 of notice of the commencement of any Proceeding against it, such indemnified party will, if a claim is to be made against an indemnifying party under such Section, give notice to the indemnifying party of the commencement of such claim, but the failure to notify the indemnifying party will not relieve the indemnifying party of any liability that it may have to any indemnified party, except to the extent that the indemnifying party demonstrates that the defense of such action is prejudiced by the indemnifying party's failure to give such notice.

(b)     If any Proceeding referred to in Section 10.7(a) is brought against an indemnified party and it gives notice to the indemnifying party of the commencement of such Proceeding, the indemnifying party will, unless the claim involves Taxes, be entitled to participate in such Proceeding and, to the extent that it wishes (unless (i) the indemnifying party is also a party to such Proceeding and the indemnified party determines in good faith that joint representation would be inappropriate, or (ii) the indemnifying party fails to provide reasonable assurance to the indemnified party of its financial capaci████████defend such Proceeding and provide indemnification with r█████to such Proceeding), to assume the defense of such Proceeding with counsel reasonably satisfactory to the indemnified party and, after notice from the indemnifying party to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will not, as long as it diligently conducts such defense, be liable to the indemnified party under this Section 10 for any fees of other counsel or any other expenses with respect to the defense of such Proceeding, in each case subsequently incurred by the indemnified party in connection with the defense of such Proceeding, other than reasonable costs of investigation. If the indemnifying party assumes the defense of a Proceeding, (i) it will be conclusively established for purposes of this Agreement that the claims made in that Proceeding are within the scope of and subject to indemnification; (ii) no compromise or settlement of such claims may be█████d by the indemnifying party without the indemnified party's consent unless (A) there is no finding or admission of any violation of Legal Requirements or any violation of the rights of any Person and no effect on any other claims that may be made against the indemnified party, and (B) the sole relief provided is monetary damages that are paid in full by the indemnifying party; (iii) the indemnifying party shall have no liability to the indemnified party hereunder until there is a final and non-appealable determination made in the Proceeding or the indemnifying party otherwise agrees in writing; and (iv) the indemnified party will have no liability with respect to any compromise or settlement of such claims effected without its consent. If notice is given to an indemnifying party of the commencement of any Proceeding and the indemnifying party does not, within ten days after the indemnified party's notice is given, give notice to the indemnified party of its election to assume the defense of such Proceeding, the indemnifying party will be bound by any final and non-appealable determination made in such Proceeding or any compromise or settlement effected by the indemnified party.

(c)     Notwithstanding the foregoing, if an indemnified party determines in good faith that there is a reasonable probability that a Proceeding may adversely affect it or its affiliates other than as a result of monetary damages for which it would be entitled to indemnification under this Agreement, the indemnified party may, by notice to the indemnifying party, assume the exclusive right to defend, compromise, or settle such Proceeding, but the indemnifying party will not be bound by any final and non-appealable determination of a Proceeding so defended or any compromise or settlement effected without its consent (which may not be unreasonably withheld).

(d)     Seller and Malafarina hereby consent to the non-exclusive jurisdiction of any court in which a Proceeding is brought against any Indemnified Person for purposes of any claim that an Indemnified Person may have under this Agreement with respect to such Proceeding or the matters alleged therein, and agree that process may be served on Seller and Malafarina with respect to such a claim anywhere in the world.

## 10.8   PROCEDURE FOR INDEMNIFICATION – OTHER CLAIMS

A claim for indemnification for any matter not involving a third-party claim may be asserted by notice to the party from whom indemnification is sought.

## 11.   GENERAL PROVISIONS

### 11.1   EXPENSES

Except as otherwise expressly provided in this Agreement, each party to this Agreement will bear its respective expenses incurred in connection with the preparation, execution, and performance of this Agreement and the Contemplated Transactions, including all fees and expenses of agents, representatives, counsel, and accountants. In the event of termination of this Agreement, the obligation of each party to pay its own expenses will be subject to any rights of such party arising from a breach of this Agreement by another party.

### 11.2   PUBLIC ANNOUNCEMENTS

The parties agree that prior to making any public announcement with respect to this Agreement or any other matter relating to the transactions contemplated hereby, each will consult with the other and will use reasonable efforts either to agree upon the text of a proposed joint announcement or to obtain the other's approval of the text of an announcement to be made solely on behalf of such party, provided that any party may make such disclosures or statement as it reasonably believes, after consulting with counsel, may be required by any Legal Requirement or any stock exchange, though the disclosing party will provide advance notice to the other party of such required disclosure as far in advance as is reasonably practicable. Prior to the Closing, Seller and Malafarina shall keep this Agreement strictly confidential and may not make any disclosure of this Agreement to any Person other than its Representatives, any party from whom a Consent is required hereunder and as are required by law. Seller and Buyer will consult with each other concerning the means by which Seller's employees, customers, and suppliers and others having dealings with Seller will be informed of the Contemplated

Transactions, and Buyer will have the right to be present for any such communication.

### 11.3    CONFIDENTIALITY

Between the date of this Agreement and the Closing Date, Buyer, Seller and Malafarina will maintain in confidence, and will cause the directors, officers, employees, agents, and advisors of Buyer and Seller to maintain in confidence, and not use to the detriment of another party any written, oral, or other information obtained in confidence from another party in connection with this Agreement or the Contemplated Transactions, unless (a) such information is already known to such party or to others not bound by a duty of confidentiality or such information becomes publicly available through no fault of such party, (b) the use of such information is necessary or appropriate in making any filing or obtaining any consent or approval required for the consummation of the Contemplated Transactions, or (c) the furnishing or use of such information is required by or necessary or appropriate in connection with legal proceedings.

If the Contemplated Transactions are not consummated, each party will return or destroy as much of such written information as the other party may reasonably request. Whether or not the Closing takes place, Seller and Malafarina waive any cause of action, right, or claim arising out of the access of Buyer or its representatives to any trade secrets or other confidential information of Seller or Malafarina except for the intentional competitive misuse by Buyer of such trade secrets or confidential information.

Except as otherwise required by law or court order, the parties and their Representatives shall protect and maintain the confidentiality of all matters related to and contemplated by this Agreement and the agreements executed and delivered in connection herewith, including any documents and information exchanged by the parties in connection wherewith ("Confidential Matters"), with the same care utilized in the protection of their own confidential or proprietary information. Furthermore, the parties agree to reveal the Confidential Matters only to their Representatives who need to know the Confidential Matters for the purpose of consummating the transaction completed hereby, who are informed of the confidential nature of the confidential Matters, and who agree to act in accordance with the terms and conditions of this Section 11.3. In the event that either of the parties or any Representative becomes compelled by court order to disclose any of the Confidential Matters, such party shall provide timely written notice so that the other party may seek a protective order or other appropriate remedy.

After the Closing, Malafarina and Seller shall not disclose and shall protect and maintain the confidentiality of all proprietary, confidential and trade secret information concerning the Assets or related to the business of Seller.

### 11.4    NOTICES

All notices, consents, waivers, and other communications under this Agreement must be in writing and will be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by telecopier (with written confirmation of receipt), provided that a copy is mailed by registered mail, return receipt requested, or (c) when received by the addressee, if sent by a nationally recognized overnight delivery service (receipt requested), in

each case to the appropriate addresses and telecopier numbers set forth below (or to such other addresses and telecopier numbers as a party may designate by notice to the other parties):

*Malafarina*:

Louis Malafarina

_____
_____
_____

Facsimile No.: _____

*Buyer*:

Barkley Evergreen & Partners, Inc.
1740 Main
Kansas City, MO 64108
Attention: Vicki Stuckwisch
Facsimile No. (816) 423-7111)

with a copy to:
Stan Johnston
Lewis, Rice & Fingersh, L.C.
1010 Walnut, Suite 500
Kansas City, MO 64106
Facsimile No. (816) 472-2500

*Seller*:

Ripple Effects Interactive, Inc.
2840 Liberty Avenue, Suite 100
Pittsburgh, PA 15222
Facsimile No.: 412.683.1610

with a copy to:
David Gurwin
Buchanan Ingersoll & Rooney PC
One Oxford Center, 20th Floor
301 Grant Street
Pittsburgh, PA 15219
Facsimile No. (412) 562-1041

## 11.5   JURISDICTION; SERVICE OF PROCESS

Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the parties in the courts of the State of Missouri, County of Jackson, or, if it has or can acquire jurisdiction, in the United States District Court for the Western District of Missouri, and each of the parties consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein. Process in any action or proceeding referred to in the preceding sentence may be served on any party anywhere in the world.

## 11.6   FURTHER ASSURANCES

The parties agree (a) to furnish upon request to each other such further information, (b) to execute and deliver to each other such other documents, and (c) to do such other acts and things, all as the other party may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

## 11.7   WAIVER

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

## 11.8   ENTIRE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter; provided, however, that this Agreement, and those documents required to be delivered by Section 2.7(a) and (b) together constitute the parties' entire agreement with respect to the Contemplated Transactions. This Agreement may not be amended except by a written agreement executed by the party to be charged with the amendment.

## 11.9   DISCLOSURE LETTER

The disclosures in the Disclosure Letter, and those in any Supplement thereto, must relate only to the representations and warranties in the Section of the Agreement to which they expressly relate and not to any other representation or warranty in this Agreement. In the event of any inconsistency between the statements in the body of this Agreement and those in the Disclosure Letter (other than an exception expressly set forth as such in the Disclosure Letter with respect to a specifically identified representation or warranty), the statements in the body of this Agreement will control.

## 11.10   ASSIGNMENTS; SUCCESSORS; NO THIRD-PARTY RIGHTS

Neither party may assign any of its rights under this Agreement without the prior consent of the other parties, except that Buyer may assign any of its rights under this Agreement to any Subsidiary of Buyer. Subject to the preceding sentence, this Agreement will apply to, be binding in all respects upon, and inure to the benefit of the successors and permitted assigns of the parties. Nothing expressed or referred to in this Agreement will be construed to give any Person other than the parties to this Agreement any legal or equitable right, remedy, or claim under or with respect to this Agreement or any provision of this Agreement. This Agreement and all of its

provisions and conditions are for the sole and exclusive benefit of the parties to this Agreement and their successors and assigns.

### 11.11  SEVERABILITY

If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

### 11.12  SECTION HEADINGS; CONSTRUCTION

The headings of Sections in this Agreement are provided for convenience only and will not affect its construction or interpretation. All references to "Section" or "Sections" refer to the corresponding Section or Sections of this Agreement. All words used in this Agreement will be construed to be of such gender or number as the circumstances require. Unless otherwise expressly provided, the word "including" does not limit the preceding words or terms.

### 11.13  TIME OF ESSENCE

With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

### 11.14  GOVERNING LAW

This Agreement will be governed by the laws of the State of Missouri without regard to conflicts of laws principles.

### 11.15  COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement as of the date first written above.

*Buyer*:

Barkley Evergreen & Partners, Inc.

By: _____

Vicki M. Stuckwisch, COO

*Malafarina*:

_____
Louis Malafarina

*Seller*:

Ripple Effects Interactive, Inc.

By: _____
Name: LOUIS MALAFARINA
Title: CHIEF EXECUTIVE OFFICER

*Page 55*

**Schedule 2.1(c)**

**Assumed Contracts**

**Office Leases:**

**Leases of Personal Property:**

**Client Contracts:**

**Other:**

## Client Contracts:

| Client | Est. | SOW Only | MSA Date | Hosting Date |
|--------|------|----------|----------|--------------|
| Asheville | 2005 | | 1/17/2006 | |
| BENU | 2005 | 5/12/2005 | | 9/21/2005 |
| BPL Global | 2007 | 12/14/2007 | | |
| Brusters | 2005 | X | | |
| CMU Heinz School | 2008 | | In Process | |
| CMU Tepper School | 2001 | | 7/1/2005 | |
| CMU UA | 2006 | | 10/17/2007 | |
| Fordham | 2006 | | 1/22/2007 | |
| Hershey | 2006 | | 1/17/2007 | |
| Highmark | 2006 | | 12/8/2005 | |
| Kansas City Convention and Visitor Association | | | 8/23/2007 | |
| KeepComingBack.com | 2007 | | 9/14/2007 | |
| Merging Media (Perillo Tours) | 2006 | 9/28/2007 | | |
| Miami, Fla University | 2007 | | 10/12/2007 | |
| Missing Kids | 2006 | | 9/26/2006 | |
| MS Society | 2006 | | 8/29/2006 | |
| Multiscope | 2004 | | | 2/2/2003 |
| NC State Univ. | 2006 | 10/6/2006 | PO 69451 | |
| NOVA | 2006 | | 10/4/2006 | |
| Olin School of Bus - Wash Univ. | 2007 | | | |
| Pace University | | | 1/28/2008 | |
| PA - DCNR | 2007 | 9/18/2007 | | |
| PA - TOURISM | 1998 | | 5/1/2004 | |
| PA DCED | 2005 | 6/7/2006 | | |
| PA Dutch | 2005 | 12/27/2005 | | |
| PA -Econ | 1998 | | 5/1/2004 | |
| PA OFE | 2005 | 1/11/2008 | | |
| PA Wilds | 2006 | 7/21/2006 | | |
| PA World Trade | 2006 | 3/12/2007 | | |
| PCA- PA Coucil for the Arts | 2000 | 11/29/2006 | | |
| Rochester - Simon School | 2007 | | 6/26/07 | |
| San Antonio Tourism | 2005 | | 8/24/2005 | |
| Sherwin Williams | 2007 | | 10/16/2007 | |
| SMI Annapolis | 2007 | | 7/17/2007 | 8/20/2007 |
| SMI Kansas City | 2007 | CMS | 8/23/2007 | |
| The Technology Collaborative (formally PDG) | 1998 | | 9/2/2002 | |
| UMKC Bloch School | 2005 | | 10/26/2005 | |
| Vanderbilt | 2004 | | 8/9/2004 | |
| Vanderbilt Law School | 2005 | | 9/16/2005 | |
| WR CASE | 2004 | 10/19/2007 | | |

Other Contracts:

HotHand Interactive, LLC
Google Earth Project Specifications
Amount ▮▮▮▮▮▮

Centradex Pennsylvania World Trade Project

Miles Media Pennsylvania DMI Services

SilverPop target email services

Internap Network Services

Expedient

24/7 media - PA ad serving

Vital stream video serving

All Webcam service providers

AT&T Wireless – employee cell phones - no formal agreement exists

Verizon Wireless – cell phones - no formal agreement exists

Highmark

United Concordia

Harleysville Disability & life